No. 20,886.

THE STATE OF KANSAS, ex rel. H. O. CASTER, as Attorney for THE PUBLIC UTILITIES COMMISSION et al., *Plaintiffs*, v. JACOB M. DICKINSON, as Receiver, etc., and THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, *Defendants*.

SYLLABUS BY THE COURT.

RAILROADS — *Interstate Commerce — Statute Requiring Interstate Passenger Trains to Stop Near State Line Unconstitutional.* Chapter 283 of the Laws of 1915, making it the duty of the public utilities commission to require interstate railroad companies to provide proper facilities, and to stop all passenger trains a reasonable time at or near the state line, was not the product of an exercise of the police power, undertakes to regulate interstate commerce in a matter already regulated by proper federal authority, casts an unwarranted burden on interstate railroad commerce, deprives interstate railroad companies of their property in lawfully established interstate passenger fares, and is unconstitutional and void.

Original proceeding in mandamus. Opinion filed November 10, 1917. Writ denied.

*F. S. Jackson,* and *H. O. Caster,* both of Topeka, for the plaintiffs.

*Paul E. Walker,* and *Luther Burns,* both of Topeka, for the defendants.

The opinion of the court was delivered by

BURCH, J.: The action is one of mandamus, to compel compliance with an order of the public utilities commission.

At its session held in the year 1915 the legislature placed on the statute book the following matter in the form of a law:

"AN ACT making it the duty of the public utilities commission to require railroad companies to provide proper facilities and to stop all passenger trains a reasonable time at or near the state line.

"*Be it enacted by the Legislature of the State of Kansas:*

"SECTION 1. That it is hereby made the duty of the public utilities commission to require every interstate railroad company operating in this state, and it shall be the duty of every such railroad company upon such requirement being made, to provide proper and convenient facilities within a reasonable distance of the state line for the stopping of every passenger train entering or leaving the state and for the alighting,

The State, *ex rel.*, v. Railway Co.

safety and protection of such passengers as desire to enter or leave such train at or near the state line, and to provide that such stop shall continue for such sufficient and reasonable time as the convenience, and safety of the traveling public may require."

(Laws 1915, ch. 283, § 1.)

Constrained by the peremptory terms of the enactment, the public utilities commission made an order, the mandate of which reads as follows:

"It is Therefore by the Commission Ordered, That the Chicago, Rock Island & Pacific Railway Company, and Jacob M. Dickinson, receiver thereof, be and they are hereby required, within thirty (30) days from the date hereof, to comply with the provisions of chapter 283 of the Session Laws of Kansas, 1915, by providing proper and convenient facilities within a reasonable distance of the state line for the stopping of every passenger train leaving the state of Kansas, and for the alighting, safety and protection of such passengers as desire to enter or leave such trains at or near the state line where the line of The Chicago, Rock Island & Pacific Railway Company crosses the state line between the states of Kansas and Missouri between the stations of Elwood, Kan., and St. Joseph, Mo., and that all such stops of passenger trains at said point shall continue for such sufficient and convenient time as the traveling public may require."

The petition pleaded the statute, the order, and disobedience of the order, and an alternative writ of mandamus was issued. The answer returned alleged that the petition and alternative writ failed to state facts sufficient to constitute a cause of action, and set forth facts relied on to show that the statute is void and the order unenforceable. The cause is submitted on the plaintiff's motion for judgment on the pleadings.

The facts admitted by the motion may be summarized as follows: The defendant is an interstate carrier of passengers, having lines of railroad entering the state from the east at St. Joseph, Mo., and Kansas City Mo., and passing through the state to others lying beyond it toward the south and west.

The St. Joseph line enters the state on a bridge 1,262 feet long over the Missouri river. The state line is at the center of the river. The St. Joseph, Mo., passenger station is 2,062 feet from the east end of the bridge, and the station of Elwood, Kan., is 2,443 feet from the west end of the bridge. Between Elwood and the Missouri river there is no community or business to be served, no demand or use for a passenger station or passenger facilities, and compliance with the

order would result in no benefit to the traveling public in the matter of service, facilities or accommodations to persons going from or returning to that locality. Interstate passenger trains are operated daily in each direction through Elwood, in sufficient number to provide sufficient and efficient passenger service for the traveling public living and doing business along the defendant's lines and for the communities served by such lines. All of the defendant's passenger trains entering or leaving the state through the station of Elwood stop there a sufficient length of time to allow passengers to enter and leave trains. Such trains supply all the service requested or required by the traveling public at Elwood, and adequate service for the surrounding territory.

The defendant maintains, under protest, passenger service within the state at the rate of two cents per mile. This rate was established by the board of railroad commissioners, the predecessor of the public utilities commission, as an emergency measure. An application to the public utilities commission to increase the intrastate rate to three cents per mile has been pending since November, 1914, a hearing has been had, but no decision had been rendered. Previous to March 1, 1915, the defendant had filed with the interstate commerce commission interstate passenger tariffs to become effective on that date, increasing the former rates. To circumvent the action of the defendant and other railroads pursuing the same course, the statute in question was passed. The bill was introduced in the legislature by the railroad committee of the house of representatives on February 20, 1915, and became effective as a law on publication in the official state paper on March 18, 1915. After a hearing on December 7, 1915, the interstate commerce commission authorized the defendant and other interstate carriers to increase their interstate passenger fares to two and four-tenths cents per mile, and since that date the only lawful interstate passenger rate through the Elwood gateway has been two and four-tenths cents per mile.

Before the act was passed the public utilities commission had ample power to require the defendant and other interstate railway companies to maintain adequate passenger service and facilities for the proper accommodation of the traveling public. By virtue of the act, power over the subject

of the act was withdrawn, the commission was deprived of judgment and discretion, and it was made mandatory on the commission to proceed as the statute directed. The purpose of the legislature was to provide a method whereby interstate passengers may, by buying tickets to and at specially provided state-line stations, accomplish the Kansas portion of their journeys at the local rate of two cents per mile, and so defeat the lawfully established interstate rate of two and four-tenths cents per mile.

The conclusions of the answer were that the act was not the product of an exercise of the police power, that it undertakes to regulate interstate commerce in a matter already regulated by the proper federal authority, that it casts an unwarranted burden on the defendant's interstate commerce, and that it deprives the defendant of its property in lawfully established interstate passenger fares.

All the contentions of the defendant are sound. The act does not deal with local situations or conditions, and has no relation to any public need for better train service or better passenger facilities at or near railroad crossings of the state line or elsewhere. Stopping trains, providing station facilities, and holding trains for such time as the traveling public may require, are purely incidental matters, and the act should have been entitled "AN ACT reducing the interstate passenger rate for the mileage in Kansas to the intrastate rate." That is the only true respect in which the public convenience and welfare are supposedly conserved. Public morals are indeed involved. The legislature undertook to provide a subterfuge whereby a regulation of interstate commerce, lawfully established under authority of the congress of the United States, the body invested by the constitution of the United States with power over the subject, may be defeated. The police power, however, was reserved to the states to promote and not to corrupt public morals. Except as indicated, the police power of the state is not involved, and the act directly affects the charges of interstate carriers for interstate passenger traffic, and if enforced would deprive interstate carriers of a substantial portion of the revenues which they would otherwise derive from interstate passenger traffic.

Under the provisions of the act, a resident of Kansas going to St. Joseph, Mo., might buy a ticket to the specially required state-line station, leave the train there, buy a ticket to St. Joseph at the interstate rate for less than five cents, and again take the train, which meanwhile had been held for him. By this means he could complete substantially his entire journey at the local two-cent rate. But the act is not confined in its operation to commerce between the state of Kansas and other states. A resident of St. Joseph, Mo., desiring to go over the defendant's line to Guymon, Okla., could complete substantially his entire trip at the local rate. Likewise a traveler from Illinois or Minnesota to Colorado or Texas, into which states the defendant's road extends, could perform the Kansas portion of his journey at the local rate. The same is true for all other interstate railways passing through Kansas. If the state of Kansas were permitted to adopt and enforce regulations of this character other states could do likewise, and the commercial anarchy which led to the adoption of that provision of the constitution of the United States which gives to congress power to regulate commerce between the states would again exist. In this instance congress has exercised its power over the subject of the statute, and through the agency of the interstate commerce commission has established the fares which the defendant, and other railway companies in its situation, may charge for interstate passenger traffic.

The public utilities commission cites four decisions of the supreme court of the United States in support of its order and the statute. Three of the decisions do not concern regulations of interstate commerce, and the opinions of the court merely contain pleasing commentaries on the police power reserved to the states. The fourth decision cited is conclusive against the commission at all points. The supreme court of Wisconsin sustained an order of the railroad commission of that state requiring a railroad company to stop a certain number of passenger trains each way daily at a designated station. The order was made pursuant to a statute which fixed the quantum of passenger service for every station coming within the classification made, and deprived the commission of any discretion in the matter. In an opinion holding

The State, *ex rel.*, v. Railway Co.

the statute to be void, the supreme court of the United States said:

"In reviewing the decision we may start with certain principles as established: (1) It is competent for a state to require adequate local facilities, even to the stoppage of interstate trains or the rearrangement of their schedules. (2) Such facilities existing—that is, the local conditions being adequately met—the obligation of the railroad is performed, and the stoppage of interstate trains becomes an improper and illegal interference with interstate commerce. (3) And this, whether the interference be directly by the legislature or by its command through the orders of an administrative body. (4) The fact of local facilities this court may determine, such fact being necessarily involved in the determination of the federal question whether an order concerning an interstate train does or does not directly regulate interstate commerce, by imposing an arbitrary requirement." (*Chi. B. & Q. Ry. v. Wisconsin R. R. Com.*, 237 U. S. 220, 226.)

It is said that the order of the public utilities commission is *prima facie* reasonable, and that the burden rests on the defendant to show that the order is unreasonable. The answer of the defendant completely discharges the burden. Besides this, the face of the order discloses that it was a purely arbitrary regulation, not intended to relate to the subject of adequate local service or facilities, the only subject within the scope of the commission's power.

The public utilities commission vicariously says that the order may be unreasonable and void, and the statute still be constitutional. That might be true if the order were the creature of the public utilities commission, but it is not. The order is the order of the legislature, precisely as if the statute read: "Every interstate railway company operating in this state is hereby required," etc., and the simple duty to see that the requirement is obeyed was imposed on the commission.

Because the statute is void, judgment is rendered on the pleadings for the defendant.

MARSHALL, J. (concurring specially): For the following reasons I concur in the judgment denying a writ of mandamus:

The legislature has power to compel all railroads within the state to provide necessary stations for receiving and discharging passengers, and to compel such railroads to stop enough trains, interstate as well as intrastate, at such stations to ac-

commodate the traveling public; but when that has been done the legislature can not compel the railroads to do more.

The statute under consideration attempts to compel all railroads within the state crossing the state line to provide station facilities and to stop all passenger trains within a reasonable distance of the state line; this without reference to the necessity or convenience of the public.

In this action it appears that the defendant has provided ample station facilities and train service for the accommodation of the public near the place named in the order of the public utilities commission.

Neither the legislature nor the public utilities commission has power to compel the defendant to stop its interstate trains, after it has amply provided for the necessities of the traveling public. It necessarily follows that the writ of mandamus should be denied.