No. 24,172.

THE STATE OF KANSAS, ex rel., A. E. HELM, Attorney for the Public Utilities Commission, *Plaintiff*, v. THE TREGO COUNTY CO-OPERATIVE TELEPHONE COMPANY, et al., *Defendants*.

### SYLLABUS BY THE COURT.

1. MANDAMUS—*Mutual Telephone Companies Subject to Supervision of Public Utilities Commission.* When a mutual telephone company and the owners of a rural mutual telephone line operated in connection therewith make traffic connections with a public telephone line and enlarge their business by renting telephones to nonsubscribers and permit their properties to be used for several years as a public utility system, their telephone business is subject to the supervision and control of the public utilities commission, and the public telephone service thus conducted may not be discontinued without the consent of such commission—following *The State, ex rel., v. Postal Teleghaph Co.,* 96 Kan. 298, 150 Pac. 544.

2. SAME—*Mutual Telephone Companies—Discontinuing Public Service Wrongfully—Restoration of Public Service Ordered.* The fact that the defendants' lines were originally designed for mutual service only and that they never applied for and never received a certificate of convenience from the public utilities commission, as prescribed by section 31 of the Public Utilities Act, General Statutes of 1915, section 8359, is no defense to an action in mandamus requiring the restoration of a public service in which the defendants were engaged and to which their property was devoted for several years, when such service was discontinued without the consent of the public utilities commission.

3. SAME—*Pleadings.* Objection to pleadings and other minor matters urged against the issuance of a writ of mandamus considered but not sustained.

Original proceeding in mandamus. Opinion filed February 10, 1923. Writ allowed.

*F. S. Jackson,* and *W. A. Smith,* both of Topeka, for the plaintiff.
*Herman Long,* of WaKeeney, for the defendants.

The opinion of the court was delivered by

DAWSON, J.: This is an original proceeding in mandamus to compel the defendants to restore a telephone service heretofore furnished to the public by them and which they have discontinued without the consent of the public utilities commission.

It appears that for some years past one of these defendants, The WaKeeney Telephone Company, was conducting a public telephone business in and about WaKeeney. It built or acquired a line running

twelve or fifteen miles south of WaKeeney. The Farmers Mutual Telephone Company of Ransom was originally a mutual telephone concern which gave service to its members only. In time a number of farmers residing north of Ransom, A. H. Barber and others, constructed a twelve-mile line running north from Ransom, which was connected with the local exchange in Ransom, and they were served by the Ransom company in substantially the same way as the original mutual subscribers. Later the line belonging to Barber and associates, farmers north of Ransom, was connected with that of the WaKeeney company so that there was through service for patrons of the WaKeeney line to Ransom, and *vice versa.* None of these lines except that of the WaKeeney company were originally designed for public service; they were intended for the mutual benefit of the subscribers only. But gradually business offered by the general public came to be accepted and charges were made and paid therefor. The Ransom company rented telephones to non-subscribers in Ransom and made an arrangement with The United Telephone Company, a trunk line concern, whereby it secured a connection beyond its own lines, and for which it exacted and received a portion of the regularly prescribed charges for such service. In this way, also, the patrons of the WaKeeney company were supplied with long-distance service—over its own lines, over the farmers' mutual line connecting therewith twelve miles north of Ransom, and over the Ransom company's lines, and through its local exchange and connection with the trunk line to the outside world.

In 1921, the defendant, The Trego County Coöperative Telephone Company, was organized and effected an arrangement with the Ransom company and Barber and his associates for mutual free telephone exchange, and on or about January 1, 1922, some of these interested parties severed the wire connecting the WaKeeney company's line with the Barber line twelve miles north of Ransom, thus interrupting and disconnecting the public utility service theretofore furnished by the WaKeeney line, the Barber line, the Ransom line and the trunk line to the outside world.

This action is brought to compel a restoration of that service, since no authority to discontinue it had been granted by the public utilities commission. That the sanction of the commission is requisite before an established public utility service can be abandoned is no longer an open question. (*The State, ex rel., v. Postal Tele-*

*graph Co.*, 96 Kan. 298, 150 Pac. 544; *The State, ex rel., v. Gas Co.*, 100 Kan. 593, 165 Pac. 1111.)

In *The State, ex rel., v. Telephone Co.*, 102 Kan. 318, 325, 170 Pac. 26, it was said:

"To avoid a possible misunderstanding, it may be added that it does not follow from anything here decided that where by mutual arrangement a connection has been established between two or more local exchanges, by which their subscribers are brought into communication with each other without charge other than such as is included in the payment of rent, such service may be discontinued (or that an additional charge may be exacted for its continuance) without the consent of the utilities commission."

But it is earnestly urged for defendants that the Ransom company and the owners of the Barber line north of Ransom never applied for and never received a certificate of convenience and authority from the public utilities commission to transact a public utility business, as prescribed by section 31 of the public utilities act, General Statutes 1915, section 8359. The plaintiff concedes this fact, but the long-established public service to which the defendants devoted their property, without complaint by the state, estops them to invoke such a defense. Indeed the state's present demand for restoration of this service is equivalent to an informal grant of permission to continue such business. For several years the defendants permitted their property to be devoted to a public use, and it is fundamental that such property is subject to governmental regulation. As said by Chief Justice Waite, in *Munn v. Illinois*, 94 U. S. 113, 24 L. ed. 77, 87:

"They entered upon their business and provided themselves with the means to carry it on subject to this condition. If they did not wish to submit themselves to such interference, they should not have clothed the public with an interest in their concerns." (p. 133.)

In the Postal Telegraph case, *supra*, it was said:

"How is the public utilities commission to discharge its important duties if the public service companies may quit business here, there, or anywhere in the state without an opportunity for the commission to determine the propriety of such a course?" (p. 305.)

Attention is called to some local litigation between Barber and his associates and certain parties interested in the WaKeeney Telephone Company, and in which the members of the public utilities commission were impleaded as defendants. That was a suit which prayed for an injunction restraining the defendants from severing the connection between the line of the plaintiffs and the line of the

Trego County Coöperative Telephone Company and "perpetually enjoining the defendants from attaching [virtually reattaching] the wire of the WaKeeney Telephone Company to plaintiff's line." The pendency of that action is of no consequence. As it happens, this court had prior jurisdiction of this main controversy; were it otherwise, it could not be used to circumvent the just rights of the state. (*The State, ex rel., v. Casualty & Surety Co.* 111 Kan. 139, 206 Pac. 331.) It is the state in its sovereign capacity which is prosecuting this action. Furthermore, it is scarcely to be imagined that the members of the public utilities commission, with all their burdensome duties, are likely to undertake a journey to the prairies north of Ransom to perform the physical act of severing or attaching telephone wires. In their official capacity the commission within its jurisdiction may order to be done whatever is proper to be done, and the enforcement of the commission's orders will be taken care of by tribunals thereunto equipped.

Some minor matters are argued for defendants. It is pointed out that the state's petition merely alleges that the Farmers' Mutual Telephone Company *is* a public utility, not that it was a public utility on January 1, 1922. However, the facts are otherwise sufficiently pleaded and sufficiently developed in the agreed statement of facts so that the real issue is in no way obscured by the use of the present tense in plaintiff's allegation. (*Custer v. Royse,* 104 Kan. 339, 343, 179 Pac. 353; *Peters v. Bank,* 106 Kan. 1, 185 Pac. 892.)

It should also be noted that the fact that the business of these defendants, although originally designed to be mutual and private, has grown and developed into a public-service business sufficiently important to merit and require the supervision of the commission is not a matter of condolence. That is exactly the way the business of the express companies grew up.

In Vol. X, Ency. Brit. (11th. ed.) 84, it is said:

"In the United States of America, express companies for the rapid transmission of parcels and luggage and light goods generally perform the function of the post office or the railways in the United Kingdom and the continent of Europe. . . . The system dates back to 1839, when one William Frederick Harnden (1813-1845), a conductor on the Boston and Worchester railway, undertook on his own account the carrying of small parcels and the performance of small commissions. Obliged to leave the company's service or abandon his enterprise, he started an 'express' service between Boston and New York, carrying parcels, executing commissions and collecting drafts and

bills. Alvin Adams followed in 1840, also between Boston and New York. From 1840 to 1845 the system was adopted by many others between the more important towns throughout the states. . . . In 1854 began the amalgamation of many of the companies. Thus under the name of the Adams Express Company the services started by Harnden and Adams were consolidated . . . in the American Express Company, under the direction of William G. Fargo, Henry Wells and Johnston Livingston, while another company, Wells, Fargo & Co., operated on the Pacific coast. The celebrated 'Pony Express' was started in 1860 between San Francisco and St. Joseph, Missouri, the time scheduled being eight days. The service was carried on by relays of horses, with stations 25 miles apart."

Moreover, in passing under the jurisdiction of the state commission the defendants are not going to be subjected to some malignant influence. The commission may require some more formality in the conduct of their business, but there are compensations. It will be defendants' duty to give adequate service at reasonable rates, but in return their business will be protected from wasteful and ruinous duplication and competition. Note the plight of one defendant in this action which has made some effort to obey the law, The WaKeeney Company. Its service has been interfered with by a new company, The Trego, for whose benefit the connection between the lines of the WaKeeney company and of the other defendants was severed in January, 1922. If the WaKeeney company and the other defendants were giving efficient and sufficient service, the Trego company should have kept out of the field or developed a field of its own. It had no right to interrupt the public service being performed by the other defendants. It was to prevent such mischievous rivalry that the law made a certificate of convenience to be issued by the commission a prerequisite to engage in a public-utility business. Of course, if the Trego company was designed and intended to engage exclusively in a mutual business, this certificate was not required (Gen. Stat. 1915, § 8329), but if it had restricted its activities to that sort of business and had not meddled with the then existing public-service business of the other defendants, this lawsuit would not have arisen.

It is also urged that the original agreement between the owners of the Barber line and the WaKeeney company was broken in 1917 when the latter began to reorder its business in conformity with the rules and rate schedules prescribed by the public utilities act. If Barber and his associates had rescinded their contract at that time, and on that account, there might have been some specious

45—112 KAN.

merit in that attitude, but for five years thereafter they acquiesced in that mode of business and in that public use of their property. Such long, continued acquiescence may well be construed as consent. Moreover, notwithstanding the technically separate ownership of the Barber line, it is essentially an integral part of the Ransom telephone system. Without its relation to the Ransom system, it would be altogether worthless; and it cannot be pretended that the Ransom concern has restricted its business to the private service of its mutual subscribers. It began to rent telephones to outsiders in 1911 and eventually made commercial traffic arrangements with a trunk line company for the interchange of messages and division of receipts. For years also it transacted a commercial business under its arrangements with the WaKeeney company.

The court discerns no merit in the arguments urged against the issuance of the writ prayed for by plaintiff. It is therefore allowed.