No. 24,708.

CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, *Appellant,* v. CLYDE M. REED, H. A. RUSSELL and JESSE W. GREENLEAF, as members of and comprising the PUBLIC UTILITIES COMMISSION; WESTERN UNION TELEGRAPH COMPANY, and THE STATE OF KANSAS on the relation of FRED S. JACKSON, *Appellees.*

SYLLABUS BY THE COURT.

1. INEFFICIENT TELEGRAPH SERVICE—*Utilities Commission May Require the Railroad Company and Telegraph Company to Improve That Service.* Where a railway company and a telegraph company for their mutual convenience, economy and profit enter into a contractual arrangement whereby a commercial telegraph service is supplied by them to the public through the use of the railway company's telegraph wires and batteries and the use of the railway station as a telegraph office and through the use of the station agent's service as a telegraph operator, and where the railway company, pursuant to such arrangement, has for years supplied the public with commercial telegraph service, but only in a careless, negligent, inefficient and unsatisfactory manner, the public utilities commission

Railroad Co. v. Utilities Commission *et al.*

may require the railway company and the telegraph company to improve that service, to keep the telegraph office open for the efficient dispatch of business for a reasonable number of hours per day, including Sunday, where the reasonable demands of the public so require, and the railway company's plea that it has no charter powers to transact a telegraph business, is no excuse to relieve it from obedience to the reasonable orders of the commission.

2. SAME—*Order Merely Requires Greater Efficiency in Service Being Performed.* The order of the public utilities commission does not require the railway company to undertake some corporate duty it is not now assuming to perform; it merely requires greater efficiency and needed improvement in the service now being performed by the railway company.

3. SAME—*Order Did Not Unlawfully or Unreasonably Interfere With Railroad Business.* The order requiring the railway company and the telegraph company to keep open the telegraph office daily for a reasonable number of specified hours, according to central time as used by the public in the locality, did not unlawfully or unreasonably interfere with the railway company's duty to operate its meager train service on mountain time.

4. SAME—*Order Neither Arbitrary Nor Unreasonable.* The order of the commission requiring improvements in the telegraph service furnished by plaintiff was neither arbitrary nor unreasonable, nor did it constitute a taking of the railway company's property without compensation.

5. SAME—*Order of Utilities Commission An Effort to Regulate Interstate Commerce—Not Within State Control.* The improved telegraph service at Oberlin ordered to be instituted by the commission was altogether of an interstate character; the order was primarily, not secondarily or incidentally, intended to accomplish that purpose, and was therefore an effort to regulate interstate commerce in a field withdrawn from state control, following decisions of the United States supreme court cited in the opinion.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed July 7, 1923. Reversed.

*Kenneth F. Burgess, T. J. Lawless, Bruce Scott,* all of Chicago, Ill., *Byron Clark, Jesse L. Root, J. W. Weingarten,* and *C. W. Krohl,* all of Omaha, Neb., for the appellant.

*Fred S. Jackson, Charles Blood Smith,* both of Topeka, and *Francis R. Stark,* of New York, N. Y., for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This action arose out of an order of the public utilities commission directing the plaintiff railway company and the cross defendant telegraph company to institute some greatly needed improvements in the telegraph service furnished by them at Oberlin, Kan.

Oberlin is the county seat of Decatur county. According to the statistics of the state board of agriculture the town has about 1,200 inhabitants, the county has some 8,000 population, chiefly devoted to agriculture and the production of live stock; the county has an assessed valuation of $18,000,000; and the value of its crops and animals sold for slaughter in 1919 was $8,750,000; in 1920, it was $8,-330,000. The city of Oberlin is situated near the center of the county and is at the end of a branch line of the Chicago, Burlington & Quincy Railroad Company and connects with one of the main lines of that company at Republican, Neb. The only other railway line in Decatur county is that of the Chicago, Rock Island & Pacific which crosses the county from east to west along its southern border. Dresden, a village on the Rock Island, is situated about 20 miles south of Oberlin. The county is poorly served by mutual telephone lines.

At Oberlin such telegraph service as there is, is furnished through a joint and contractual arrangement between the plaintiff herein, the Chicago, Burlington & Quincy Railroad Company, and the cross defendant, the Western Union Telegraph Company. The railway company owns the wires, the telegraph batteries, the telegraph office in the railway depot; and the railway's station agent is the telegraph operator. Telegraph messages are received by him and sent over the railway wires to McCook, Neb., where they are forwarded over Western Union wires to all parts of the country including Kansas. The earnings of this telegraphic traffic are divided between the railway company and the telegraph company on terms agreeable to them.

At the hearing before the public utilities commission it was clearly shown that the telegraph service furnished by the plaintiff and cross defendant to the public in Oberlin and Decatur county was inefficient, slow, and altogether unsatisfactory, that letters by United States mail from Kansas City, Topeka, Omaha and elsewhere, 300 miles or 400 miles away, were usually delivered in Oberlin before telegrams from the same points and forwarded at the same time. Oberlin citizens who had business affairs in these cities and who were accustomed to telegraph to their homes in Oberlin as to the time of their return by railroad had repeatedly reached their homes in time for a night's sleep and had gotten to their places of business next day before the arrival of these telegrams. One witness, the vice president of a national bank in Oberlin, testified:

"The things I am objecting to is the fact that many times a message sent

·from away from here is not transmitted to my office. As much as three days have intervened between the sending and delivery of a message. On numerous occasions messages sent from . . . Kansas City, or from the Western Union office in Kansas City and Topeka, advising my office the date of my return, and to send the car for me at some point, I would be in on a certain train, possibly Saturday, I have been compelled to wake up the garage man to get a car and drive to Oberlin. Monday morning I would go down to my desk and during the day, Mr. Howard, the operator, would call up and say message for Benton Investment Company, and I would take my message, my own name was signed to it. It has happened on numerous occasions, and illustrates the kind of service we have."

### Another witness, a banker, testified:

"On a number of occasions I have sent telegrams to the station at nine o'clock A. M., our time, eight o'clock central time, and the boy in returning reported there was nobody there he could file the telegram with at eight o'clock central time. . . . Agent would say, 'I was out checking over cars and getting out freight, and the boy is up town for something that we have got to have, and I am out checking freight cars, and the station is locked.' If it were open at nine o'clock for the bank it would be all right, because that is our opening time. At 11:15 a. m., mountain time, train comes in. We present ourselves there for the purpose of sending messages. Impossible to get anybody to take them for filing purposes for the reason that the train was then on the track or just coming in. Immediately following the arrival of the train the express has to be gotten out, and he cannot bother with a message. Then by the time he is ready to take your message, the door to the station is sometimes locked. The agent tells me he is out with the express. I have gone down to the station at six o'clock a dozen times and the door was locked and during the noon hour. Noon hour for the agent, and nobody in there keeping the office open. Not our lunch hour. Helper was not there, nor anybody else. I have been down to the station twenty minutes of five, his time, ten minutes after his train had gone and nobody there. Impossible to file a message or anything else. I have complained to him and he had excuses in every case. He was so busy checking freight cars or working up his books that he could not do it. He has always been courteous, no trouble from that standpoint, but he is so busy that he cannot get his book work up and express checked and freight cars tagged, and attend to these telegrams at the same time. If we had efficient service while we had it, a lot of our complaint would be relieved; that is, if when we send a telegram it got right out and we got our answer, part of the complaint would be relieved. If the office were actually open during the hours it is supposed to be, that would help some. . . . I know it is practically impossible under ordinary circumstances to send a telegram between nine and twelve, and between two and four-thirty except just at times. We have sent quite a lot of telegrams by the way of Dresden, and are at the present time, but are a little bit fearful, because once or twice we addressed a telegram that way, and the reply which came through was addressed to Dresden. I don't live there and the agent there didn't know who it was, and it laid there and I never received it. . . . We have had a great

deal of trouble in the banking business. The fact is that when we send a message we want to get a reply. Sometimes it involves a transfer of money and we want to get a reply that we can use. We want it delivered, and by asking for delivery we get a delivery; sometimes we do not unless we ask for it. Have tried to send messages through Dresden, and answers came back through Dresden' and were not delivered. We would not have anything to file except it came by mail. We might get a message in the course of a week. We are grasping for anything that will give us service on messages. Last week a gentleman came into the bank and asked us to wire for money for him. He came in at nine o'clock, said he had to have money, and had broken his car. We telegraphed at nine o'clock. No answer at four-thirty, nor at six o'clock. He went to McCook and the next day about eleven o'clock we got the answer to the telegram we had sent the previous morning at nine o'clock. We telephoned him at McCook and he came back to get his money. . . . A man in Denver, Colorado, a customer of our bank, prepared a sight draft through the Drovers National Bank of Denver on a car of horses, and wired us he would be here to cover his sight draft, and if it was presented to hold for the shipment of the horses. . . . The sight draft was here from the bank before we got the message, and the man also. He came by way of Dresden, got here for breakfast. We opened the mail and there was his sight draft."

The people of Oberlin and Decatur county generally use central time, while the railway company operates its station, telegraph office, and the branch railway, by mountain time, which adds to and aggravates the public's just dissatisfaction with the otherwise careless and inefficient service portrayed by the testimony just quoted. Other business men gave similar testimony, showing how their business affairs were hampered by the poor service furnished by plaintiff, how they had formerly subscribed to the Commercial News Dispatch service furnished by the railway company and the telegraph company but had abandoned it because its delivery was too slow for practical use. The witnesses also showed the expensive devices they had to use to get their telegrams out over mutual telephone lines to the telegraph service on the Rock Island line on the south side of the county.

The plaintiff made practically no showing to counteract the evidence which tended to prove the inefficient character of the telegraph service furnished at Oberlin. All it did do was to show that by some order of the interstate commerce commission the railway service at Oberlin should be operated on mountain time, and that through negotiations with some labor union, having the approval of the federal railroad labor board, the telegraph operator could not, without additional expense, be kept on duty for the extra hour or two which it would require to give adequate and efficient telegraph

Railroad Co. v. Utilities Commission *et al.*

service to the people of Oberlin and thereabout in Decatur county. But it was shown, however, that the just grounds of complaint at the inefficient telegraph service referred to interstate telegraph service, to the slow and unsatisfactory receipt, dispatch and delivery of telegrams to and from Denver, Kansas City and Omaha, and to distant places in Kansas, and that all telegrams had to be routed through McCook, Neb., and that the purely intrastate telegraph business was altogether negligible—only six telegrams, earning $2.50, in the whole year preceding the hearing. This trifling minimum of intrastate business may have been caused in part, perhaps, by the wretched character of the service furnished by the plaintiff. For local points not too distant from Oberlin, even the poor service furnished by the rural telephone lines of northwest Kansas was superior to the telegraph service furnished by plaintiff, so the public patronized them or used the United States mail rather than use plaintiff's telegraph service. However, the intrastate telegraph business at Oberlin would necessarily be inconsequential even if efficient service were given by plaintiff since defendant's railway and telegraph lines in Kansas running out of Oberlin are short and connect with plaintiff's trunk lines in Nebraska some 50 miles northeast.

After a full hearing the Public Utilities Commission made the following findings and order:

"The commission further finds that there is a contract relationship between the Western Union Telegraph Company and the Chicago, Burlington & Quincy Railroad Company, by the terms of which the Western Union Telegraph Company furnishes certain facilities to the railroad company by means of which the railroad company is able to operate its trains, and the railroad company furnishes offices, light and heat at certain of the stations on its line of railroad and that as a result of this contractual relationship the railroad company and the telegraph company are jointly engaged in the furnishing of commercial telegraph service at the city of Oberlin, Decatur county, Kansas, and said telegraph service is furnished by means of the contractual relationship which exists between the railroad company and the telegraph company, and said joint enterprise is the only means by which the public at Oberlin, Kansas, would be enabled to have any telegraph service whatever; and said Western Union Telegraph Company and Chicago, Burlington & Quincy Railroad Company by their joint enterprise as set out herein, have jointly held themselves out to the public as being willing to receive and transmit telegraph messages to any part of the United States and have taken upon themselves the burden and made their property subject to a public use as set out herein.

"The commission further finds that at the present time, the Chicago,

Burlington & Quincy Railroad Company is operated upon mountain time, while the public at Oberlin, Decatur county, Kansas, conduct their business in accordance with central time and on account of this fact, the telegraph offices at this station is closed during the hour of one to two, central time, which is the time of day when the telegraph service at this station should be available to the public at Oberlin, Kansas.

"The commission further finds that the telegraph office at Oberlin, Kansas, opens at 9 o'clock a. m., central time, and closes at 6 p. m., central time.

"The commission further finds that the telegraph service being furnished at this time by the Western Union Telegraph Company and the Chicago, Burlington & Quincy Railroad Company at Oberlin, Kansas, is unreasonably inefficient and insufficient.

"It is therefore by the commission ordered: That effective thirty (30) days from the date of this order, the said Western Union Telegraph Company and Chicago, Burlington & Quincy Railroad Company, shall render commercial telegraph service to the public at Oberlin, Decatur county, Kansas, as follows: Said telegraph office shall be open during week days for the receipt and transmission of messages from 8 a. m., central time, to 12 noon, central time, and from 1 p. m., central time to 6 p. m., central time. During the hours above named, continuous efficient and sufficient service shall be rendered at all times.

"It is further ordered: That said telegraph office shall be open for receipt and transmission of messages for one hour during the forenoon on Sunday and for one hour during the afternoon on Sunday."

The railway company applied to the district court for an injunction to restrain the public utilities commission from enforcing the order. Issues were joined, testimony introduced for plaintiff and for defendants. The evidence was substantially the same as that heard by the commission. The injunction was denied; the plaintiff and the telegraph company were commanded to put the order of the commission into effect; hence this appeal.

The railway company makes the chief complaint against the judgment, the Western Union merely trailing but agreeing in effect with the principal contentions of the railway company. These will be noted in the order of their importance.

The railway company first argues that it has no corporate duty to give telegraph service at Oberlin, that under its corporate character granted by the state of its domicile, Illinois, and under its corporate license in Kansas, it has no grant of power to engage in telegraph service. If the state of Illinois or the state of Kansas has any grievance against the railway company for the usurpation of corporate powers not within the scope of its charter, that may be the

Railroad Co. v. Utilities Commission *et al.*

subject of another lawsuit. The railway company through its contractual arrangement with the telegraph company does now give a certain kind of commercial telegraph service in Oberlin, and this lawsuit is only concerned with the question whether it should be required to do a better job of it, not whether the railway company should be required to undertake something it does not now pretend to do. It pretends to receive and dispatch commercial telegraph messages offered by the public for a few hours in the day, and to accept pay therefor. In a slipshod fashion it has done this for years. The public, in this lawsuit, has no concern with the contractual arrangement between the railway and the Western Union, nor with their arrangement for the use of each other's facilities and employees, nor with their disposition of the telegraph earnings. The plaintiff railway company is giving a poor, inefficient, and unsatisfactory service at Oberlin. It had no right to undertake that business unless it intended in good faith to do a reasonably good job of it. Having assumed the power, it must exercise it in a satisfactory manner. Having taken up the task of giving telegraph service and having exercised the power of doing so, how absurd it is for it to resist a reasonable demand to exercise that power efficiently and to discharge that duty with reasonable energy and satisfaction to its patrons. In *The State, ex rel., v. Telephone Co.*, 112 Kan. 701, 212 Pac. 902, the question of lack of power to do a public telephone business for want of a license was raised as an excuse for abandoning such business, but this court said:

"But it is earnestly urged for defendants that the Ransom company and the owners of the Barber line north of Ransom never applied for and never received a certificate of convenience and authority from the public utilities commission to transact a public utility business, as prescribed by section 31 of the public utilities act, General Statutes 1915, section 8359. The plaintiff concedes this fact, but the long-established public service to which the defendants devoted their property, without complaint by the state, estops them to invoke such a defense. Indeed the state's present demand for restoration of this service is equivalent to an informal grant of permission to continue such business. For several years the defendants permitted their property to be devoted to a public use, and it is fundamental that such property is subject to governmental regulation. As said Chief Justice Waite, in *Munn v. Illinois*, 94 U. S. 113, 24 Law Ed. 77, 87:

" 'They entered upon their business and provided themselves with the means to carry it on subject to this condition. If they did not wish to submit themselves to such interference, they should not have clothed the public with an interest in their concerns.' "   (p. 703.)

And so here, this railway company has for some years at Oberlin, and doubtless elsewhere at many stations on its line, undertaken in connection with the Western Union or some other telegraph company, to supply certain facilities and perform certain duties in furnishing the public with commercial telegraph service, and its plea of *ultra vires* must therefore be disregarded.

It is urged that the order of the public utilities commission interferes with the railway company's duty to conform to the acts of congress (Act of Mar. 19, 1918, Act of Aug. 20, 1919, 41 U. S. Stat. at L. 280) and the order of the interstate commerce commission (51 I. C. C. 273), which requires the Oberlin branch railway to be operated on mountain time. This court fails to discern any such interference. The only passenger train on this branch arrives at Oberlin about an hour before noon and leaves about midafternoon. The arrival and departure of freight trains is not shown, but it nowhere appears that to open the telegraph office for public business at 8 a. m., central time, and to keep it open, except for an hour at midday, until 6 p. m., central time, and to furnish a couple of hours' service on Sunday, would interfere with the operation of the railway trains on mountain time in the slightest degree. If by reason of a contract with a labor union or otherwise, the one telegraph operator at Oberlin could not be kept on duty for so many hours per day, without extra compensation, the public convenience cannot be interfered with for any such excuse. The public convenience is paramount. The public was not a party to that contract. It was the duty of the railway company and of the labor union to take into account the reasonable needs of the public when that labor contract was made. At all events the labor union contract would not prevent the payment of extra wages for extra time nor prevent the employment of an additional operator if the reasonable demands of the public for adequate telegraph service could not be otherwise met.

Plaintiff also hints, but only hints, at two other propositions in its brief, (*a*) that the order is arbitrary and unreasonable, and (*b*) that it constitutes a taking of its property without just compensation. We fail to see where these two points are seriously pressed in plaintiff's brief; and indeed there is no merit in either of them. There is no want of income at Oberlin to meet the expense of the service required, and it was shown conclusively that the inadequate service had depleted the telegraph earnings to a very considerable degree. Moreover, a public service corporation is entitled to no

profit until it has met the reasonable needs of the public for service. (*Atlantic Coast Line v. N. Car. Corp. Com'n*, 206 U. S. 1, 51 Law Ed. 933; *Mo. Pac. Ry. Co. v. Kansas*, 216 U. S. 262, 54 Law Ed. 472.) The order of the public utilities commission was eminently reasonable, and compliance therewith should be cheerfully given by both corporations. It seems to us that it is only because the Chicago, Burlington & Quincy Railroad is a relatively inconsequential concern in Kansas that so plain and simple a case for public relief, for needed improvement in public service, could ever rise to the dignity of a lawsuit in this court. It can hardly be conceived that one of the great railroad systems of this state, like the Santa Fe or the Union Pacific, would let its telegraph service at a county seat like Oberlin deteriorate to the degree shown in this record; and it may well be doubted whether in Nebraska where this plaintiff is a railway of some consequence it conducts its telegraph service at any county seat in such a slovenly, negligent fashion as it does at Oberlin, although, indeed, one of its witnesses ventured the opinion that at one place in Nebraska, Imperial, its service was no better than it is in Oberlin.

But we now come, however, to plaintiff's main contention—that the order of the public utilities commission constitutes a regulation of interstate commerce. Reluctantly, if we correctly understand the decisions of the United States supreme court, we will have to concede that this last point is unassailable. The evidence all tended to show that the wretched telegraph service into and out of Oberlin was of an interstate character. All the complaints concerning the service were directed at the delays incident to getting telegrams forwarded which had to be relayed through McCook, Neb., to points in other states; and the exasperating slowness of deliveries of telegrams in Oberlin were all concerning messages which had been sent from places like Denver, Omaha, and Kansas City, Mo. The telegrams to and from Oberlin to points in Kansas had virtually all to be forwarded through McCook, Neb. Even this latter sort of service is undeniably interstate in character under controlling decisions of the federal supreme court. (*Hanley v. Kansas City S. R. Co.*, 187 U. S. 617, 47 Law Ed. 333.)

In *Western Union Tel. Co. v. Speight*, 254 U. S. 17, 65 Law Ed. 104, the case related to damages for mistake in the transmission of a telegram from Greenville, N. C., to Rosemary, in the same state, which telegram in the ordinary course of business had to pass over

the telegraph company's wires through Virginia for part of the distance. The supreme court of North Carolina took the old and once recognized view that since both termini were in North Carolina the telegram was intrastate in character, but the federal supreme court said:

"The transmission of a message through two states is interstate commerce as a matter of fact. *Hanley v. Kansas City Southern R. Co.*, 187 U. S. 617, 47 L. Ed. 333, 23 Sup. Ct. Rep. 214. The fact must be tested by the actual transaction. *Kirmyer v. Kansas*, 236 U. S. 568, 572, 59 L. Ed. 721, 724, 35 Sup. Ct. Rep. 419.

"As the line was arranged and had been arranged for many years, ever since Roanoke Rapids had been an independent office, Richmond [Virginia] was the relay point from Greenville to the latter place. . . . As things were, the message was sent in the quickest way. The court below did not rely primarily upon the finding of the jury as to the purpose of the arrangement, but held that when, as here, the termini were in the same state, the business was intrastate unless it was necessary to cross the territory of another state in order to reach the final point. This, as we have said, is not the law." (p. 105.)

In *Western Union Tel. Co. v. Foster*, 247 U. S. 105, 62 Law Ed. 1006, 1 A. L. R. 1278, the validity of an order of the Massachusetts public service commission requiring certain telegraph companies to desist from discrimination against a certain broker in their delivery of market quotations came under review. The federal supreme court held that the business was interstate and free from state regulation, and said:

"If the transmission of the quotations is interstate commerce, the order in question cannot be sustained. It is not like the requirement of some incidental conveniences that can be afforded without seriously impeding the interstate work. It is an attempt to affect in its very vitals the character of a business generically withdrawn from state control—to change the criteria by which customers are to be determined and so to change the business." (p. 114.)

See, also: *Leibengood v. Railway Co.*, 83 Kan. 25, 109 Pac. 988, and note in 28 L. R. A., n. s., 985 *et seq.; Kirby v. Railroad Co.*, 94 Kan. 485, 489, 490, 146 Pac. 1183.

And so here, it is useless to cite the Madison Branch case, 76 Kan. 467, 92 Pac. 606, 216 U. S. 262, 54 Law Ed. 472, because there was in fact a very substantial intrastate business to be regulated and which required regulation, and the fact that the just demands of the state for adequate intrastate railway service on the Madison Branch incidentally affected and regulated interstate commerce did not invalidate the order of the state commission. Nor do the decisions relating to the state's right to stop interstate trains to ade-

quately supply the intrastate demands for reasonable local service, and thus incidentally affect and regulate interstate commerce reach the case before us. (See discussion and excerpt from *Chi. B. & Q. Ry. v. Wisconsin R. R. Com.*, 237 U. S. 220, in *The State, ex rel., v. Railway Co.*, 101 Kan. 660, 665, 666, 168 Pac. 838; *St. Louis-San Francisco R. Co. v. Public Service Com.*, Law Ed. advance sheets, No. 12, p. 425, decided Mar. 19, 1923.)

In this case, if it were shown that there was any substantial intrastate telegraph service at Oberlin to be regulated, or a real need or reasonable demand for that service, the state, through its public utilities commission, could order such service to be supplied and the order in question would be perfectly reasonable and just, for there is neither confiscation nor other injustice or oppression in its terms so far as the record discloses; and the fact that such an order would incidentally affect and to some extent regulate the interstate telegraph business would not invalidate the order nor stay the hand of the district court or of this court to enforce it. But there is no intrastate telegraph business to speak of at Oberlin—merely six telegrams which realized earnings of $2.50 in a whole year, and there was no complaint concerning the local service. What the people of Oberlin and Decatur county want and are entitled to is prompt and satisfactory telegraphic service over the railway and telegraph wires interlacing the great business cities of the country and all intermediate points. The order of the commission was intended to secure that service, on evidence pertinent thereto. That order was primarily, not secondarily or incidentally, a regulation of interstate commerce. As said by the federal supreme court in *Western Union Tel. Co. v. Foster*, supra, the order "was an attempt to affect in its very vitals the character of a business generically withdrawn from state control."

It follows that the public at Oberlin and Decatur county must seek elsewhere for that improvement in the telegraph service to which they are justly entitled, and the judgment of the district court denying the plaintiff's application for an injunction must be reversed and the cause remanded with instructions that it is granted.

It is so ordered.