STATE OF MISSOURI ex rel. BARRETT, Atty. Gen., et al. v. KANSAS NATURAL GAS CO. (KANSAS CITY GAS CO., Intervener).

(District Court, W. D. Missouri, W. D. June 30, 1922.)

No. 361.

1. Commerce ⬤=33—Interstate transportation of natural gas is "interstate commerce."

The transportation of natural gas from one state to another is "interstate commerce."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. Commerce ⬤=48—"Burden" on interstate commerce defined.

As respects the power of a state directly to affect, regulate, or burden interstate commerce, "burden" means anything that imposes either a restrictive or onerous load upon such commerce.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Burden.]

3. Commerce ⬤=57—State cannot regulate rate chargeable for gas by interstate carrier.

A state or its Public Service Commission has no authority to regulate the rate chargeable for gas by a company transporting it from another state and delivering it in interstate commerce to a distributing company.

4. Commerce ⬤=46—Interstate carrier of gas held not to have submitted itself to state regulation.

Though a gas company's franchise required it to disclose the source of its supply, a company supplying it with natural gas brought into the state from other states held not to have thereby voluntarily submitted itself to the jurisdiction of the state.

5. Commerce ⬤=12—State cannot directly regulate interstate commerce.

The power of direct regulation of interstate commerce, whether Congress has entered the field or not, cannot be and is not lodged in the state, though local interests are indirectly affected by such commerce.

In Equity. Suit by the State of Missouri, on the relation of Jesse W. Barrett, its Attorney General, and another, against the Kansas Natural Gas Company, in which the Kansas City Gas Company intervened. Decree for defendant.

⬤=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Jesse W. Barrett, Atty. Gen., and R. Perry Spencer, Gen. Counsel, and James D. Lindsay, Asst. Gen. Counsel of Public Service Commission, both of Jefferson City, Mo., for complainant.

H. O. Caster and R. D. Garver, both of Bartlesville, Okl., and Richard J. Higgins, of Kansas City, Kan., for defendant.

J. W. Dana, of Kansas City, Mo., for intervener.

VAN VALKENBURGH, District Judge. Complainant, the state of Missouri, at the relation of the Attorney General of the state, and the Public Service Commission of the state, filed a bill of complaint against the Kansas Natural Gas Company, praying a permanent injunction against said company, to restrain it from increasing the price of gas sold by it to local distributing companies in the state, to the extent of 5 cents per 1,000 cubic feet, over the rates heretofore in effect, without first procuring the consent and approval of the Public Service Commission. Such increase of 5 cents per 1,000 cubic feet, the Kansas Natural Gas Company has informed the distributing companies, would be effective after the so-called April meter readings of 1922. The Kansas Natural Gas Company also advised the distributing companies that, unless they complied with the rates announced and fixed by them, they would discontinue supplying gas to the distributing companies. The Kansas City Gas Company, which purchases gas from the Kansas Natural and distributes such gas so purchased at Kansas City, filed its intervening petition herein and asked, among other things, the same relief as that prayed by complainant.

The defendant filed answers to the bill of complaint and the intervening bill, in which answers it asserts that it is engaged in the transportation of gas from the state of Oklahoma, into and through the state of Kansas, and into the state of Missouri; that such gas is sold by it in Kansas and Missouri; and that therefore its business is interstate commerce, and as such is free from the regulation herein sought to be imposed. The three parties, complainant, intervener, and defendant, have executed and filed an agreed statement of facts, which is supplemented by evidence of a documentary nature, introduced by complainant and intervener. The facts thus established, in so far as they may be necessary to a decision of the points in controversy, are hereinafter sufficiently disclosed. Upon the record thus made, the cause is presented for final hearing upon the application for permanent injunction against the Kansas Natural Gas Company from raising its rate 5 cents per 1,000 cubic feet at the gates of the cities, on the ground that the company has submitted itself, either directly or impliedly, to the jurisdiction of the Public Service Commission, and that it has no right to raise that rate without first applying to the commission, and then only subject to its orders, with a right to review the commission's findings, on the ground that the same are confiscatory and unreasonable.

The whole question has been submitted to the court upon one proposition; i. e., the power of the commission respecting this application. The cases chiefly relied upon are the Langdon Case and the so-called Pennsylvania Case, in 249 U. S. at page 236, 39 Sup. Ct. 268, 63 L.

Ed. 577, and 252 U. S. at page 23, 40 Sup. Ct. 279, 64 L. Ed. 434. The Langdon Case concerned itself entirely with the question of whether the right existed in the receivers of the Kansas Natural Gas Company to enjoin the utilities commissions and the municipalities from interfering with a raise of rates by a local distributing company; that was the real issue in that case. The Supreme Court had occasion to advert to some other principles involved, and the case becomes important, principally from that standpoint. The court said that the transportation and sale of gas through pipe lines from one state to another is interstate commerce, and that as a part of such commerce the receivers might sell and deliver gas so transported to local distributing companies, "free from unreasonable interference by the state;" they were under no compulsion to accept an unremunerative price.

It has been stated and shown, with respect to those conditional contracts, that conditions have been so materially changed that it is at least a matter of doubt, if not conclusively established, that those contracts as such are no longer binding as to the terms imposed by them.

[1] Some question is raised here as to what is meant by the expression "free from unreasonable interference by the state." In the Pennsylvania Gas Case, the court had to do with the gas company as a distributing agent. There gas was distributed directly to the consumers in different cities and localities therein mentioned, by the pipe line company, and the court held that when that was the situation the company came under the regulating power of the state, because what was done was a local intrastate business, and not interstate commerce, to which reference had been made in the Langdon Case, and they had occasion to differentiate the Langdon Case from the Pennsylvania Case, which was then before the court, and it is not without significance that, in deciding a question which came clearly within the local power, control, and regulation of the state, it should have been thought necessary by the Supreme Court to point out the difference existing between the different classes of commerce, interstate as against intrastate. The court says:

"We think that the transmission and sale of natural gas produced in one state, transported by means of pipe lines and directly furnished to consumers in another state, is interstate commerce within the principles of the cases already determined by this court."

So we are left with no doubt as to the fact that this conclusively establishes that the transportation of natural gas from one state to another is interstate commerce, and that far we have no difficulty in reaching a final conclusion.

The court further said:

"The general principle is well established, and often asserted, that the state may not directly regulate or burden interstate commerce. That subject, so far as legislative regulation is concerned, has been committed by the Constitution to the control of the federal Congress. But, while admitting this general principle, it, like others of a general nature, is subject to qualifications not inconsistent with the general rule, which now are as well established as the principle itself. * * * In varying forms, this subject has frequently been before this court. The previous cases were fully reviewed and deductions made therefrom in the Minnesota Rate Cases, 230 U. S. 352."

Now, it is significant that the court places the application of this principle upon the same basis as in the case of railroad regulation and transportation; so that we may have some light thrown upon the question by referring to the principles applicable to such cases. The Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, of course, very exhaustively clear up the entire subject, and it is unnecessary to go to any other decided cases, in order to learn what the principles involved are, and to learn where the line of demarcation falls. After stating the limitations, it was said in the Minnesota Rate Cases, 230 U. S. 402, 33 Sup. Ct. 741, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18:

"But within these limitations there necessarily remains to the states, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction, although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending federal intervention. Thus there are certain subjects, having the most obvious and direct relation to interstate commerce, which nevertheless, with the acquiescence of Congress, have been controlled by state legislation from the foundation of the government, because of the necessity that they should not remain unregulated and that their regulation should be adapted to varying local exigencies; hence the absence of regulation by Congress in such matters has not imported that there should be no restriction, but rather that the states should continue to supply the needed rules until Congress should decide to supersede them. Further, it is competent for a state to govern its internal commerce, to provide local improvements, to create and regulate local facilities, to adopt protective measures of a reasonable character in the interest of the health, safety, morals, and welfare of its people, although interstate commerce may incidentally or indirectly be involved. Our system of government is a practical adjustment, by which the national authority as conferred by the Constitution is maintained in its full scope, without unnecessary loss of local efficiency. Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the state appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the federal power. In such case Congress must be the judge of the necessity of federal action. Its paramount authority always enables it to intervene at its discretion for the complete and effective government of that which has been committed to its care, and, for this purpose and to this extent, in response to a conviction of national need, to displace local laws by substituting laws of its own. The successful working of our constitutional system has thus been made possible."

Now, in the Pennsylvania Gas Case, 252 U. S. at pages 30, 31, 40 Sup. Ct. at page 281 (64 L. Ed. 434), the court said:

"The rates of gas companies transmitting gas in interstate commerce are not only not regulated by Congress, but the Interstate Commerce Act expressly withholds the subjects from federal control. * * * The thing which the state commission has undertaken to regulate, while part of an interstate transmission, is local in its nature, and pertains to the furnishing of natural gas to local consumers within the city of Jamestown in the state of New York. The pipes which reach the customers served are supplied with gas directly from the main of the company which brings it into the state; nevertheless the service rendered is essentially local, and the sale of gas is by the company to local consumers, who are reached by the use of the streets of the city in which the pipes are laid, and through which the gas is conducted to factories and residences as it is required for use. The service is similar to that of a

local plant furnishing gas to consumers in a city. This local service is not of that character which requires general and uniform regulation of rates by congressional action, and which has always been held beyond the power of the states, although Congress has not legislated upon the subject."

[2] Now, we shall have occasion, from the cases cited in the Pennsylvania Case, to see to what extent it lies within the power of a state directly to affect, regulate, or burden interstate commerce, and by "burden" is meant anything that imposes either a restrictive or an onerous load upon the commerce; so any taxation is a burden, although the states have the right to tax, still a direct tax on interstate commerce is not permitted at all, because it is a direct burden. It may not be a prohibitive or exclusive burden; but it is a burden, and to that extent it falls without the power of the state. It becomes important to consider the exact meaning of this phrase, in differentiating the cases which arise in which interstate commerce is to some extent involved—the cases where the right to burden or affect is denied, and those in which the power of the state is sustained because of local interest, and where Congress had not entered the field. In a case like this, if Congress undertook to regulate the rates for the transportation and sale of gas transported in interstate commerce, as an incident to that it would have a right, undoubtedly, to regulate the intrastate business which was so interwoven with the interstate commerce as to make it a part of it. That is shown by the Minnesota Rate Cases. It was said there that the states had always regulated rates in the states, where it was purely a matter of intrastate commerce, and, while the government had exercised control over all interstate rates, that it had never entered the field or sought by any regulation or administrative policy to take away from the states the right to control commerce that was purely intrastate; but in the Minnesota Rate Cases Justice Hughes said that clearly Congress had the right to do that if it signified its intention; it had the power to do it, and since then that principle has been fully recognized.

In the case of Schollenberger v. Pennsylvania, 171 U. S. 1, on page 13, 18 Sup. Ct. 757, on page 762 (43 L. Ed. 49), this is said:

"To the same effect we think is the case of Railroad Company v. Husen, 95 U. S. 465, 469, in which it was said that, 'whatever may be the power of a state over commerce that is completely internal, it can no more prohibit or regulate that which is interstate, than it can that which is with foreign nations.' The court, therefore, while conceding the right of the state to enact reasonable inspection laws to prevent the importation of diseased cattle, held the laws of Missouri there under consideration to be invalid, because it prohibited absolutely the introduction of Texas cattle during the time named in the act, even though they were perfectly healthy and sound. The court said that a state could not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce. Reasonable and appropriate laws for the inspection of articles, including food products, were admitted to be valid, but absolute prohibition of an unadulterated, healthy, and pure article has never been permitted as a remedy against the importation of that which was adulterated and therefore unhealthy or impure."

I am quoting, because of certain principles that have been laid down, and because I prefer to state them in the language of the Supreme Court, and as indicating what is meant by the cited cases that are applicable to the case before us.

In Brown v. Maryland, 12 Wheat. 419, loc. cit. 423 (6 L. Ed. 678), the court said:

"If Maryland has a right to enact laws of this description, she has a right to regulate her own foreign commerce, although, by the Constitution, it is exclusively vested in Congress. The imposition of import duties is often resorted to, not for the purpose of revenue, but to regulate commercial intercourse with foreign countries. Discriminating duties, protective duties, prohibitory duties, are so many commercial regulations. These may all be resorted to, under the guise of license laws. If Maryland has a right to pass general license laws, she may pass partial ones; she may select particular commodities and burden their sale with a license duty; she may establish a tariff of discriminating duties for herself, and affect, if not defeat, the commercial policy of the country."

In Heyman v. Hays, 236 U. S. 178, 35 Sup. Ct. 403, 59 L. Ed. 527, the court says:

"The right to engage in interstate commerce is not the gift of a state; it cannot be regulated or restrained by a state, nor can a state exclude from its limits a corporation engaged in such commerce."

And the court, in the same case, cited West v. Kansas Natural Gas Co., 221 U. S. 229, loc. cit. 260, 31 Sup. Ct. 564, 573 (55 L. Ed. 716, 35 L. R. A. [N. S.] 1193), wherein it was observed:

"At this late date it is not necessary to cite cases to show that the right to engage in interstate commerce is not the gift of a state, and that it cannot be regulated or restrained by a state, or that a state cannot exclude from its limits a corporation engaged in such commerce."

Now, the Minnesota Rate Cases, again, have some particular phrases in them that require special notice in this connection. I refer to Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, in which it is said:

"Even without action by Congress, the commerce clause of the Constitution necessarily excludes the states from direct control of subjects embraced within the clause which are of such a nature that, if regulated at all, their regulation should be prescribed by single authority. There is thus secured the essential immunity of interstate intercourse from the imposition by the states of direct burdens and restraints."

The court, in the same case, further said (230 U. S. loc. cit. 396, 33 Sup. Ct. 739, 57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18):

"If a state enactment imposes a direct burden upon interstate commerce, it must fall regardless of federal legislation. The point of such an objection is not that Congress has acted, but that the state has directly restrained that which in the absence of federal regulation should be free. If the acts of Minnesota constitute a direct burden upon interstate commerce, they would be invalid, without regard to the exercise of federal authority touching the interstate rates said to be affected. On the other hand, if the state, in the absence of federal legislation, would have the power to prescribe the rates here assailed, the question remains whether its action is void as being repugnant to the statute which Congress has enacted."

In the same opinion the court further said (230 U. S. loc. cit. 399, 33 Sup. Ct. 740, 57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18):

"The grant in the Constitution of its own force—that is, without action by Congress—established the essential immunity of interstate commercial inter-

course from direct control of the states with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation, the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, states may act within their respective jurisdictions until Congress sees fit to act, and, when Congress does act, the exercise of its authority overrides all conflicting legislation. * * * The principle which determines this classification underlies the doctrine that the states cannot under any guise impose direct burdens upon interstate commerce."

In the case of Wabash v. Illinois, 118 U. S. 557, loc. cit. 571, 7 Sup. Ct. 4, 10 (30 L. Ed. 244), the Supreme Court holds that interstate commerce which is national in its character is subject to regulation by Congress exclusively. The court, in its opinion, said:

"The line which separates the power of the states from this exclusive power of Congress is not always distinctly marked, and oftentimes it is not easy to determine on which side a particular case belongs. Judges not unfrequently differ in their reasons for a decision in which they concur. Under such circumstances, it would be a useless task to undertake to fix an arbitrary rule by which the line must, in all cases, be located. It is far better to leave a matter of such delicacy to be settled in each case upon a view of the particular rights involved; but we think it may safely be said that state legislation which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. * * * The river Mississippi passes through or along the borders of ten different states, and its tributaries reach many more. The commerce upon these waters is immense, and its regulation clearly a matter of national concern. If each state was at liberty to regulate the conduct of carriers while within its jurisdiction, the confusion likely to follow could not but be productive of great inconvenience and unnecessary hardship. Each state could provide for its own passengers, and regulate the transportation of its own freight, regardless of the interest of others. Nay, more, it could prescribe rules by which the carrier must be governed within the state in respect to passengers and property brought from without. On one side of the river or its tributaries, he might be required to observe one set of rules, and on the other, another. Commerce cannot flourish in the midst of such embarrassments. * * * And it would be a very feeble and almost useless provision, but poorly adapted to secure the entire freedom of commerce among the states, which was deemed essential to a more perfect union by the framers of the Constitution, if, at every stage of the transportation of goods and chattels through the country, the state within whose limits a part of this transportation must be done could impose regulations concerning the price, compensation, or taxation, or any other restrictive regulation interfering with and seriously embarrassing this commerce."

Those remarks are thought pertinent in the case at bar. This gas originates in Oklahoma, passes through Kansas, and comes into Missouri, and, of course, if the principle contended for by complainant is indulged, there might be, could be, and probably would be, such regulation in these various states as in a very prohibitive degree to burden, restrict, and embarrass the commerce of this Nation.

[3, 4] Now, having it clearly disclosed that this is interstate commerce, and from all that has been said here, and from reading back the reports and decisions upon which the conclusion was based that there can be no direct regulation or burden of strictly interstate commerce by the states, it would seem to be beyond question that the state here,

and its Public Service Commission, has no authority to regulate the rate to be charged for such commerce by the defendant company. Of course, it is contended that the company has so far subjected itself, by bringing its product into the state, and by doing so through mains and certain instrumentalities that have been established and built for that purpose, that it has voluntarily submitted itself to the jurisdiction of the state, and that, notwithstanding the fact that this is interstate commerce, it is still subject to state regulation.

I cannot indulge the contention that by the contract—by the supply contract which was made between the Kansas City Gas Company and the Kansas Natural Gas Company—the Kansas Natural Gas Company necessarily or impliedly became a party to the franchise, and therefore subject to the control of the state. It never has been my opinion that that was the effect of that contract. It was simply that the Kansas City Gas Company, when that franchise was granted, was required by the city to disclose the source of its supply, so that the city would be apprised where it could get the gas, and upon what terms it could get it; but there never has been any contractual relation between the Kansas Natural Gas Company and Kansas City, and there never has been anything involved in the franchise which imposes a necessary duty upon the Kansas Natural, of which the city could avail itself directly, but simply it was known that the gas was to be procured from the Kansas Natural and its predecessors, and, necessarily, the city recognized that the company had to have some way to make the connections, whereby that supply could be effective; and in the Pennsylvania Case, by means of transportation through the state and into the state, that feature was far more pronounced than in this case, yet there was no disposition by the Supreme Court in that case to recognize that for that reason the gas company had placed itself within the jurisdiction of the state authorities with respect to commerce strictly interstate.

[5] Now, it is very probable, of course, that this is a commodity that should, in some way, be regulated. As the Supreme Court has said, that is a matter confided to the federal Congress. There is no doubt that these gas companies, furnishing gas throughout the United States, should have some body that may exercise control over them; but I am compelled to stand for what I believe the law has been disclosed to be, that the power of direct regulation of interstate commerce, whether Congress has entered the field or not, cannot be and is not lodged in the state. The fact that indirectly at the end of this interstate commerce local interests are affected is not decisive of the question. It is necessary that this company, itself, must have intervened in local affairs, as an instrumentality taking part in local distribution and in local operation connected with that commerce, before local jurisdiction can be conferred.

This answers the question of "reasonableness" which has been raised, and we are compelled to come to the conclusion that, under the rules announced by the court, any direct burden or regulation upon commerce which is distinctly interstate is unreasonable. Judge Pollock, in the District of Kansas, in the case of Central Trust Co. v. Consumers' Light, Heat & Power Co., 282 Fed. 680, in which was in-

volved the right of the Kansas Natural Gas Company to increase its rates in Kansas without the consent of the Public Utilities Commission of that state, came to the same conclusion as that announced in this opinion.

I am compelled to conclude, therefore, that the injunction prayed must be denied.