No. 31,790

BOARD OF PUBLIC UTILITIES OF KANSAS CITY, etc., et al., *Appellees*,
v. KANSAS CITY POWER & LIGHT COMPANY, *Appellant*.

(33 P. 2d 320.)

Opinion filed June 9, 1934.

*Fred M. Harris, B. W. Kelsey,* both of Ottawa, *W. H. Lucas, Thad B. Landon* and *Ludwick Graves,* all of Kansas City, Mo., for the appellant.

*Charles W. Steiger, Frank P. Eresch,* both of Topeka, for the state corporation commission, *William Drennan, C. W. Trickett* and *Otto Ziegelmeyer,* all of Kansas City, for the board of public utilities of Kansas City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This appeal presents the question whether a city which owns its electric light and power plant requires a certificate of convenience from the state corporation commission before it can extend its transmission lines and services outside the corporate limits of the municipality.

For some years past the city of Kansas City has owned and operated its light plant. The plant was constructed and from time to time has been enlarged with funds derived from the sale of bonds issued by the city under various statutes. At this time bonds so issued and outstanding amount to $1,850,000.

The appellant, Kansas City Power & Light Company, for many years past has owned and operated a system of electric power lines and has supplied electric services to the public throughout Wyandotte county outside of Kansas City. It holds a certificate of convenience and necessity issued by the state commission authorizing it to operate this system and to supply these services; and there is no dispute in this record that it serves the public efficiently and sufficiently, and at rates sanctioned by state authority. Its capital

investment in Wyandotte county is valued at $1,114,188.78, and it pays about $25,000 annual taxes in Wyandotte county.

Some time in the spring of 1933 the official managing board of the Kansas City municipal electric plant decided to extend its transmission lines into certain suburban districts outside the corporate limits of the city and along the public roads thereabout for two and one-half miles. The proposed lines will parallel the transmission lines of the appellant—in some places at distances no greater than fifteen to fifty feet.

On March 14, 1933, the Kansas City board of public utilities filed with the state corporation commission certain plans, specifications and blue prints for its proposed transmission lines and applied for the approval thereof. The statute which vests the state commission with supervision of the stringing of utility wires along and across public highways is a measure concerned with the safety of life and property. (Laws 1917, ch. 252; R. S. 66-183, 66-184.) It is a separate enactment from the general statute regulating public utilities. (Laws 1911, ch. 238, R. S. 66-101 *et seq.*)

Following its usual practice in utility controversies, the state commission held a public hearing at which the appellant presented its protest and objections to the granting of the application, which may be summarized thus:

The Kansas City Power and Light Company at great expense had constructed a large system of transmission and distribution lines in the territory sought to be invaded by the applicant; that it was adequately serving the territory, and that neither public convenience nor necessity justified the intrusion of another utility; and that such intrusion would unreasonably injure, interfere with and damage the lines and services of the utility already occupying the territory, and deprive it of its property without due process of law and in violation of its rights guaranteed by the federal and state constitutions. Another objection, and the one of more immediate concern in this appeal, was—

"That the applicant herein has no legal right to engage in the transmission and sale to consumers of electric current beyond the boundaries of Kansas City, Kan., without having first secured from this commission a certificate of public convenience and necessity."

The hearing before the state corporation commission covered many matters needless to narrate. At its conclusion the application was granted. The commission delivered a written opinion in which it

analyzed the pertinent statutes and cited the decision of this court in *Humphrey v. City of Pratt,* 93 Kan. 413, 114 Pac. 197. Its concluding paragraphs read:

"The commission finds that the applicant is not required in this case to secure a certificate of public convenience.

". . . The proposed plans, specifications and location have been approved by the chief engineer of the commission, and the commission finds that said application should be granted, and said plans, specifications and location approved."

From this ruling the Kansas City Power & Light Company appealed to the district court, and the matter was reviewed on a transcript of the proceedings before the commission. The court held that the findings, decision and order of the commission were lawful and reasonable, and that they should be sustained and approved.

From that decision the controversy is now brought here for review.

The statutory requirement that any person or corporation desiring to serve the public in the capacity of a public utility must first obtain a certificate of convenience is section 31 of the general utilities act, which reads:

"No common carrier or public utility governed by the provisions of this act shall transact business in the state of Kansas until it shall have obtained a certificate from the public utilities commission that public convenience will be promoted by the transaction of said business and permitting said applicants to transact the business of a common carrier or public utility in this state. . . ." (R. S. 66-131.)

This section, however, must be read in connection with section 3 of the same act, parts of which read:

"The term 'public utility,' as used in this act, shall be construed to mean every corporation, company, individual, . . . that now or hereafter may own, control, operate or manage, except for private use, any equipment, plant, generating machinery, or any part thereof, . . . for the production, transmission, delivery or furnishing of heat, light, water or power: *Provided,* That this act shall not refer to or include mutual telephone companies. . . . Nothing in this act shall apply to any public utility in this state owned and operated by any municipality. . . ." (R. S. 66-104.)

The powers of city-owned public utilities have been prescribed and alternately limited and extended by various enactments, the latest of which appears to be section 1 of chapter 110 of the Laws of 1919, which reads:

"Any city operating any waterworks, fuel, power or lighting plant or sewer system may extend its mains, transmission lines or pipe lines within or without the city by construction or purchase, when applications have been made and

agreements entered into by persons along the proposed extension that will produce a revenue in the judgment of the governing body, sufficient to pay interest on the cost of the extension, and the operating cost of the product or service furnished." (R. S. 12-821.)

Supplementary to the paragraph just quoted is chapter 126 of the Laws of 1929 which, among other matters, vests the management of a municipal light plant in any city of more than 100,000 inhabitants in a special board of five persons. Parts of the fourth section of this act read:

"That the board of public utilities shall have the exclusive control of the water plant and the electric-light plant and shall be charged with the duty of producing and supplying the city and its inhabitants with water and electric energy for domestic and industrial purposes and for public use in the city, and may sell and dispose of any surplus outside of the city. . . . And may in the name of the city take and hold by purchase, gift, devise, bequest or otherwise such franchises and real or personal property either within or without the city as may be needful or convenient for the carrying out of the intended purposes for which it is established. . . . The board of public utilities may establish all reasonable rules and regulations to protect the rights and property vested in the city and under control of the board; . . . and shall also have such other powers as may be necessary for the proper discharge of its duties." (R. S. 1933 Supp. 13-1223.)

A literal construction of the foregoing statutory provisions indicates a legislative purpose to exclude city-owned utilities from the governance of the general utilities act. At its inception that act declared that nothing within its terms should apply to any public utility owned and operated by any municipality. (Sec. 3.) While this act has been amended from time to time, nothing the legislature has since declared can be construed to minimize the emphatic assurance there given that utilities owned by a municipality should be exempt from the regulatory control of the state commission created by the utilities act. Those of us whose memories go back far enough and remain clear enough to recall the sharp controversies which attended the advocacy of the utilities act can understand how necessary to its enactment was the legislative assurance in section 3 that *some* public utilities were to be wholly excluded from its control, to wit, mutual telephone companies and municipally owned utilities; and that even the power to regulate and control privately owned utilities serving wholly or principally one city should be vested *exclusively* in the city government with only a limited review vested in the state commission. (Laws 1911, ch. 238, §§ 3 and 33; R. S. 66-104, 66-133.)

It would be beside the point to suggest that such was not the best way to regulate and control public utilities—by leaving out of state control for the time being the city-owned utilities, and by partly leaving out of state control the privately owned utilities which wholly or principally served only one city. The act as written was the best then obtainable; and in the case of *Humphrey v. City of Pratt*, 93 Kan. 413, 144 Pac. 197, where a taxpayer sought to enjoin the city from issuing bonds to provide funds for the equipment of a light plant, for one reason, among others, that the city had not obtained a certificate of convenience from the state commission as prescribed in section 31 of the public utilities act, the judgment denying an injunction was affirmed by this court. The pertinent section of the syllabus reads:

"Section 31 of the public utilities act (Laws 1911, ch. 238), providing that no public utility shall transact business until it shall have obtained a certificate from the public utilities commission that the public convenience will be promoted does not apply to a public utility, such as an electric-light plant, owned and operated by a municipality." (§ 4.)

In the course of the opinion Mr. Justice Burch said:

"The plaintiff desires the court to impose upon this statute a limitation, neither expressed by or implied from its terms, restricting its application to public utilities owned and operated by any municipality at the time the law took effect. The argument is that competition may be as destructive to private and public welfare as monopoly, and that the judgment and permission of an unbiased administrative board are just as essential when a municipal corporation is about to undertake the construction and operation of a light plant as when a private corporation desires to do so. Conceding this argument to be economically sound, it should be addressed to the legislature which indisputably disregarded it by the plain and unambiguous exclusion from the definition of 'public utilities' of public utilities owned and operated by municipalities. To strain the definition to include municipally owned utilities brought into being subsequent to the enactment of the statute would be to amend the law and not to interpret it." (p. 417.)

Neither the legislature nor this court has said anything that weakens the potency of the rule there stated. The successive enactments which the legislature has since made, apparently at the instance of Kansas City, and which have eventuated in a grant of power to the defendant board to extend the transmission lines and electric services of the city plant beyond the corporate limits, were certainly not intended to subject that municipal plant to the control of the state corporation commission. Rather the contrary. The power to thus extend the lines and services of the city plant is vested

expressly in the defendant board. It is needless to debate the wisdom or the justice of this arrangement, the necessary result of which will be to subject the appellant to the competition of a utility which pays no taxes and which may possibly—we do not decide—cut rates to such an extent as to compel the appellant to abandon the territory with the irreparable losses which would necessarily. ensue. At one time and another this court has endeavored to justify the regulations of the public utilities act, by pointing out that notwithstanding its burdens it had its compensations. Thus, in *State, ex rel., v. Telephone Co.*, 112 Kan. 701, 705, 212 Pac. 902, where the dominion of the state commission had been resisted by the defendants but upheld by this court, it was said:

"Moreover, in passing under the jurisdiction of the state commission the defendants are not going to be subjected to some malignant influence. The commission may require some more formality in the conduct of their business, but there are compensations. It will be defendants' duty to give adequate service at reasonable rates, but in return their business will be protected from wasteful and ruinous duplication and competition. . . . It was to prevent such mischievous rivalry that the law made a certificate of convenience to be issued by the commission a prerequisite to engage in a public-utility business."

In the case just cited a mutual company, which was exempt from the act, undertook the public service of operating its plant as a part of another system, which was subject to regulatory supervision of the state commission. In so doing, however, it ceased to be a mutual company as defined by the act, and in such manner it came under the dominion of the state commission. Appellant argues that the same result should follow the extension of the Kansas City municipal plant when it goes outside the city limits to transact business. Although the "compensations" of state control may be considerably diminished, so far as concerns this appellant, by the inexcusable invasion of its trade territory by the municipal competition of Kansas City, that is simply a weakness—a possible injustice—which the legislature alone can correct. We must hold that the plain and unequivocal provisions of statutes conferring on the city and its official board the power to extend its lines and services outside the city do not permit us to give such an interpretation to those statutes nor to append such a potent addition to the language of section 3 of the utilities act, which declares:

"Nothing in this act shall apply to any public utility in this state owned and operated by any municipality."

Counsel for appellant call our attention to language in some of our opinions which is susceptible of being construed to hold that every public utility is subject to the control of the state commission, if not in the first instance, then at least by the power vested in it to hold a statutory review under the provisions of section 33 of the act. (R. S. 66-133.) However, when those cases are critically examined it will be found that none of them dealt with city-owned utilities. (*Kansas Gas & Electric Co. v. Public Serv. Com.*, 122 Kan. 462, 251 Pac. 1097; *Kansas Gas & Electric Co. v. Public Serv. Com.*, 124 Kan. 690, 261 Pac. 592.)

The diligence of counsel has also brought together a number of instructive cases from other jurisdictions and governed by statutes not greatly at variance with our own. (*Jochimsen v. City of Los Angeles*, 54 Cal. App. 715; *City of Pasadena v. Railroad Commission*, 183 Cal. 526; *Yamhill Elec. Co. v. City of McMinville*, 130 Ore. 309; *Holmes v. Fayetteville*, 197 N. C. 740.)

See, also, notes and citations of cases dealing with applicability to city-owned utilities of general statutes on the regulation and control of public utilities in 10 A. L. R. 1432; 18 A. L. R. 946; 76 A. L. R. 851-855; and 3 Pond's Public Utilities, 4th ed., § 894.

These cases have been examined; and while the powers granted to the several state commissions to regulate and control public utilities are not precisely like those conferred on the corporation commission of this state, in all of them, except Wisconsin, where the statute is plainly at variance with ours (*Pabst Corporation v. Milwaukee*, 190 Wis. 349, cited in *Holton Creamery Co. v. Brown*, 137 Kan. 418, 422, 20 P. 2d 503), the extension of governmental control over local public utilities and city-owned utilities seems to have been as emphatically withheld from the control of the state official board, as is so clearly reflected in the pertinent Kansas statutes. In general and as far as they are analogous, the last-cited cases are in accord with the decision we are impelled to make in this case.

The judgment is affirmed.