No. 40,271

STATE OF KANSAS, ex rel. Harold R. Fatzer (John Anderson, Jr., substituted), Attorney General of the State of Kansas, and the STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Plaintiffs*, v. SINCLAIR PIPE LINE COMPANY, a Delaware Corporation, SINCLAIR CRUDE OIL COMPANY, a Delaware Corporation, PRODUCERS PIPE LINE COMPANY, INC., a Kansas Corporation, and MARVIN E. BOYER, *Defendants*.

(304 P. 2d 930)

Opinion filed December 8, 1956.

*C. C. Linley*, general counsel, and *D. C. Martindell*, of Hutchinson, argued

the cause and *Charles R. Escola*, assistant general counsel, state corporation commission, *John Anderson, Jr.*, attorney general, *Charles C. McCarter* and *Thomas Evans*, both assistant attorneys general, and *John F. Hayes*, of Hutchinson, were on the briefs with them for the plaintiffs.

*George Stallwitz*, of Wichita, argued the cause and *W. F. Lilleston*, of Wichita, *A. A. Davidson* and *Dudley C. Phillips*, both of Independence, were with him on the briefs for the Sinclair Pipe Line Company.

*Stanley E. Toland*, of Iola, argued the cause and was on the briefs for the Producers Pipe Line Company, Inc., and Marvin E. Boyer.

*Malcolm Miller*, of Wichita, argued the cause and *George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Robert N. Partridge* and *Robert M. Siefkin*, all of Wichita; and *Ralph W. Garrett, Cecil R. Buckles*, and *James H. McGowan*, all of Tulsa, Oklahoma, were with him on the briefs for the Sinclair Crude Oil Company.

The opinion of the court was delivered by

SMITH, C. J.: This is an original action in mandamus by the state on the relation of the attorney general and the corporation commission. An alternative writ was issued. The four defendants filed motions to quash the writ. The cause was finally submitted on such motions pursuant to an order of this court.

The petition alleged various powers of the commission, among them the supervision of the disposition of franchises and properties and the termination of services and the fixing of rates and charges; that defendant Sinclair Pipe Line Company, which will be referred to herein as Pipe Line Company, was engaged in the transportation of petroleum products by pipe line within the state and was a public utility within the meaning of G. S. 1949, 55-501, 66-104 and 66-105, and among the pipe-line systems operated by it in the state was one from the vicinity of Wellsville to the vicinity of Humboldt, known as the Paola-Humboldt system, and one from Eureka to Humboldt, known as the Eureka-Humboldt (these will be referred to as the Paola and Eureka systems); that defendant Sinclair Crude Oil Company, which will be referred to herein as Crude Oil Company, had for its primary business the purchasing of crude oil, including the purchasing along the above two pipe-line systems; that both the above systems were controlled and under the domination of the Sinclair Oil Corporation, a holding company which owned all the stock of each.

The petition further alleged that the Producers Pipe Line Company (hereinafter referred to as Producers) did not produce oil but purchased and sold it and maintained pipe lines and was a

public utility within the meaning of G. S. 1949, 55-501, 66-104 and 66-105, and as such was within the jurisdiction, authority and control of the corporation commission; that defendant Boyer was instrumental in the incorporation of Producers and was a stockholder and was also engaged in trucking oil from the territory served by the two pipe lines and was jointly involved with the two pipe lines in the matters set forth. The petition alleged also that under order of a federal court of three judges, Boyer had been for several months trucking to Humboldt the crude oil available along the Eureka line, which prior to September 30, 1955, had been transported through the pipe-line system; that the Pipe Line Company was incorporated about November 9, 1950, and about that time it acquired the two pipe lines and also acquired a trunk line for transportation of oil from Humboldt to Illinois, where a refinery of the Sinclair Refining Company was located; that both the Paola and the Eureka had been used for over thirty-five years to transport the flush production of crude oil produced along the two systems; that the Pipe Line Company did not produce any oil but used the systems to transport oil purchased by other Sinclair companies from various producers; that each of the systems was used exclusively to transport oil produced in Kansas to Humboldt, and at Humboldt the oil was placed in tanks and then introduced into the pipe lines of the Pipe Line Company, which transported it to Sinclair's consignees; that on April 22, 1953, the Sinclair Oil Corporation caused the Crude Oil Company to be incorporated and soon thereafter it began purchasing oil from producers along the Paola and Eureka systems; that prior to September 30, 1955, the oil purchased by the Crude Oil Company was transported by the Pipe Line Company from the leaseholders' tank batteries to working tanks at Humboldt, all within the state of Kansas, and then placed in the trunk line of the Pipe Line Company for transportation to Sinclair consignees; that in the summer of 1955, the Pipe Line Company began negotiations for the sale of the two pipe-line systems lying wholly within the state of Kansas and as a result Producers was incorporated and thereafter entered into a contract to purchase the two pipe-line systems from Sinclair; that the Crude Oil Company joined Producers in negotiations for the sale of the two systems to Producers; that Producers agreed to pay the Pipe Line Company $275,000 for the two pipe-line systems and certain equipment and agreed to pay $80,000 for oil in the Paola line at

the time it was to take place, also to pay $25,000 for other equipment; that $105,000 was to be paid at the time of transfer and the balance was to be paid at the rate of five cents per barrel for each barrel of oil delivered through the Paola line and arriving at Humboldt, so that the operators would actually pay the balance owing; that it was agreed Producers would only ship its own oil through the lines and it would be sold to the Crude Oil Company at Humboldt and Sinclair would pay ten cents per barrel above their posted price to Producers for the oil so delivered; that it was agreed no oil would be shipped through the Eureka line but Boyer would truck all the oil lying along that line and charge the leaseholders much in excess of the charge for carrying oil in the pipe-line system and it was agreed that the Eureka system would be salvaged and abandoned and a trucking system substituted at increased charge to producers; that Sinclair Crude Oil Company agreed to purchase oil from wells along either pipe line, which was first purchased and then transported by Boyer or Producers and the Pipe Line Company and Producers agreed not to transport any oil in the two systems unless it was oil purchased by the Crude Oil Company or its predecessors; that the Pipe Line Company agreed to transport such oil from Humboldt to the Sinclair refinery in Illinois; that by this plan the Crude Oil Company would continue to purchase the oil but would do so at Humboldt rather than at the lease level.

The petition then alleged that the Pipe Line Company prior to October 1, 1955, refused to transport any oil in either system except that purchased by the Crude Oil Company and there was no practical way to transport oil produced along the two systems other than by such pipe lines; that by the acts described the Pipe Line Company and Crude Oil Company had established what amounted to a monopoly of the oil purchases in the territory; that there was no other qualified buyer of crude oil in the area who was in a position to buy the quantities of oil necessary for continued operation of the stripper wells in question and defendants by their mutual and joint arrangement had controlled the purchase, transportation, sale, hauling and indirectly the production of oil in the vicinity; that pursuant to the arrangement the Crude Oil Company served notice that after September 30, 1955, it would not purchase oil along the two pipe-line systems other than transported by Producers or Marvin E. Boyer; that defendants had planned to make the operation of the Eureka line appear unprofitable, when there actually

were 1,000 barrels a day available, much of which the Pipe Line Company had refused to accept for transportation and if it were accepted the line would be profitable.

The petition then alleged that following the execution of the agreement on or about September 14, 1955, the Crude Oil Company gave written notice to producers along the two systems it would cease purchasing oil on September 30, 1955, such notice being given sixteen days prior to its effective date, contrary to the custom in the oil fields to give thirty days' notice in such cases and after such date the Crude Oil Company declined to buy oil along the two systems unless it was owned or transported by Producers or Boyer.

The petition then alleged that none of the defendants ever made a formal application to the Kansas Corporation Commission for authority to sell or purchase the two systems or to abandon the Eureka and neither Producers nor Boyer made application to the commission for a certificate of authority, although neither party could lawfully transport oil without such certificate; that on October 1, 1955, there were about 250 leases and 3,942 wells producing oil along the two systems and oil from 2,492 of them was transported through the two systems; that they were stripper wells and produced from one-third barrel to ten barrels a day and were located in non-prorated fields; that their daily aggregate was 4,960 barrels; that the stripper wells in Kansas produced 40,000 barrels a day valued at about $108,000 and abandonment of stripper wells for too long a time will result in permanent loss of the oil concerned and if the steady movement of oil is stopped great damage and waste would result to the natural resources of the state; that the cost of transportation in the two systems governed the continued production from the field and even a slight increase in the cost of transportation might cause the abandonment of the wells; that prior to the shutdown of the Eureka system the operators were paid a posted price per barrel at the wellhead, which was a net income, and since the shutdown oil from such wells had been trucked to market by reason of an order of the federal court and under the terms of this order the net income to operators had been almost the same as when the line was functioning and if this oil must be transported by truck the net price to the operator will be decreased by sixty cents a barrel and this will cause the abandonment of such stripper wells; and the monopolistic plan of the defendants would force some producers to uneconomic production and the state and the commission had an

interest and a duty to determine whether such waste should be allowed; that the facts concerning waste were alleged to indicate that a serious question concerning waste existed and should be presented to the commission to determine whether the proposed plan of defendants would result in waste prohibited by statute.

The petition then alleged the receiving by the commission of a complaint from producers complaining of the waste that would occur if the proposed abandonment should take place; that it was set down and notice of a hearing given and pending such hearing negotiations concerning the abandonment and sale of the two systems was ordered held in *status quo* and this order was served on all defendants before the date of possession was to be delivered.

The petition then alleged that plaintiffs in this action on September 30, 1955, filed an action in the district court of Shawnee county and procured an order holding matters in *status quo* until a hearing by the commission could be had and except for the Crude Oil Company the defendants were the same as here; that on October 10, 1955, that commission having learned that the *status quo* was not being maintained issued a supplemental order to the Crude Oil Company and the Pipe Line Company directing them to resume the normal purchase of oil and its transportation until such time as the matter could be heard by a commission.

The petition then alleged that on October 13, 1955, the Pipe Line Company filed a suit for an injunction in the federal court to enjoin these plaintiffs from taking any jurisdiction; that Producers was granted leave to intervene; that on the same day Crude Oil filed a similar action in the federal court and the defendants named removed to the federal court the action pending in the district court of Shawnee county.

The petition then alleged that in the actions in federal court the defendants filed actions to dismiss and on the same date the judge of the United States district court ordered Producers to operate the Paola line at its own expense and to have a responsible trucker, including Boyer, transport oil produced along the Eureka; that a three-judge federal court heard the motions to dismiss and made a decision which contained a paragraph as follows:

"For these reasons the court concludes that the proceedings should be stayed and it is hereby stayed for a period of 20 days to afford the Attorney General and the Corporation Commission an opportunity to institute a proper proceeding in the state court where the speediest determination of the issues herein presented may be had. Pending the filing of such an action, the order

of this court with respect to the operation of the pipe lines in question and the duty to continue to take and transport such oil shall remain in force and effect."

The petition then alleged that Producers was operating the Paola line and Boyer was trucking oil produced along the Eureka line, pursuant to the order of the federal court, but that neither of them had a right to transport such oil until a certificate of convenience and necessity had been procured from the commission, which certificate had not been procured.

The petition then alleged this action was brought in pursuance of the order of the federal court just quoted to determine whether the corporation had the power to regulate the sale or abandonment of a part of a pipe line lying wholly within the state of Kansas; that defendants claimed the commission had no such authority while the commission claimed it did have such authority under G. S. 1949, ch. 55, art. 5 and 6, and ch. 66, art. 1.

The petition then alleged that defendants had ignored the orders of the commission and caused it to be restrained from having a hearing and plaintiffs were without any adequate remedy at law.

The prayer was that an alternative writ issue, ordering that defendants restore the operation of the two pipe-line systems; that they seek approval of the commission of the contractual arrangements described insofar as they affect the continued operation of the wells along the Eureka and Paola systems and the Pipe Line Company make application to the commission for permission to abandon the Eureka system and to sell it in an abandoned condition and that Producers make application for a certificate of convenience and authority to operate the Paola system and that Boyer make application for a certificate of convenience and authority to truck oil along the Eureka system. The plaintiffs further prayed that if defendants failed to show cause, as required by the alternative writ, that the writ be made peremptory.

An alternative writ was issued by this court pursuant to the above prayer returnable on March 17, 1956. On the date the alternative writ was issued an order by consent of all parties was issued by us restraining defendants from abandoning operation of either the Paola or Eureka systems as they were being operated under the orders of the federal court and the corporation commission was restrained to the effect that all its orders were suspended and the plaintiff's application for an operating order was set for hearing in the courtroom at a date to be set.

The Crude Oil Company filed a motion to quash the alternative writ on the grounds that its allegations and the attached exhibits showed the proceeding was not within the original jurisdiction of this court; showed that there was a misjoinder of parties; failed to state facts sufficient to entitle the plaintiffs to any relief against the Crude Oil Company and did not state facts sufficient to constitute a cause of action in that if the controversy was to have a determination of whether the commission had power to regulate the sale or abandonment of a part of a pipe line lying wholly within the state, then the action should be dismissed and the alternative writ should be quashed because from the allegations and exhibits shown the Crude Oil Company had no interest in such pipe-line systems; and if the controversy was as stated by the three-judge court as to whether the commission had jurisdiction to require the Crude Oil Company to purchase crude oil from designated individuals in designated areas at designated prices, pursuant to any statute of Kansas, then there was no statutory authority giving it the power to require the Crude Oil Company to use its private funds to engage in the purchase of crude oil under such circumstances and if any statute should be so construed it would violate the federal constitution and that of Kansas as an unwarranted interference with is rights to run its own business, would violate the due process clause, the equal protection clause, the contract clause and the commerce clause.

The other three defendants filed substantially similar motions to quash.

Plaintiff points out a motion to quash the alternative writ in a mandamus action is similar in a legal sense to a demurrer to a petition in an ordinary action. No motions were directed at this petition—hence plaintiff argues it must be liberally construed in favor of the plaintiff and all facts well pleaded must be taken as true.

The defendants filed lengthy answers and returns to the alternative writ, but on account of the rule just stated they may not be considered at the present stage of this action.

While conceding the above rule as to the construction of a petition, defendants point out that where a cause of action depends in a large measure on attached exhibits of written instruments and the exhibits conflict with the allegations of the petition, then the recitals in the exhibits are controlling. (See *Wood v. Stewart*, 158

Kan. 729, 150 P. 2d 331; and *Zane v. International Hod Carriers B. & C. L. Union,* 155 Kan. 87, 122 P. 2d 715.) Also that where specific allegations conflict with general allegations the specific allegations control. (See *Pierce v. Schroeder,* 171 Kan. 259, 232 P. 2d 460.) We shall consider this petition with these rules in mind.

The commission asks that we order the four defendants to restore operations of the two pipe-line systems to their *status quo* as of September 30, 1955, or in the alternative that the Pipe Line Company make application to the commission for authority to abandon the Eureka system and to sell it and the Paola system to Producers; that Producers make application to the commission for a certificate of convenience and necessity to operate the Paola system and that defendant Boyer make application to the commission for a certificate of convenience and necessity to truck oil along the Eureka system.

The plaintiff depends on certain rather well known sections of our statute. G. S. 1949, 55-501, provides:

"All pipe lines laid, built or maintained for the conveyance of crude oil within the state of Kansas are hereby declared to be common carriers, and said conveyance of said oil shall be in the manner and under the restrictions in this act provided."

G. S. 1955 Supp., 55-504, provides in part:

"The corporation commission shall have the general supervision and control over all such persons, firms, associations or corporations in the performance of said business . . ."

G. S. 1949, 66-101, provides in part:

"The state corporation commission is given full power, authority and jurisdiction to supervise and control the public utilities and all common carriers . . ."

G. S. 1955 Supp., 66-104, provides in part:

"The term 'public utility,' . . . shall be construed to mean every corporation, . . . that now or hereafter may own, control, operate or manage . . . any equipment . . . for . . . the conveyance of oil . . . through pipe lines in or through any part of the state. . . ."

G. S. 1949, 66-105, provides in part:

"The term 'common carriers', as used in this act, shall include all . . . pipe-line companies, . . ."

G. S. 1949, 66-141, provides:

"The provisions of this act and all grants of power, authority and jurisdiction herein made to the commissioners, shall be liberally construed, and all inci-

dental powers necessary to carry into effect the provisions of this act are hereby expressly granted to and conferred upon the commissioners."

It will be noted these sections deal with common carriers or public utilities.

Defendants argue further they deal with intrastate as compared with interstate activities. The outcome of the action depends upon these two points in the light of the allegations of the petition and the exhibits attached.

Prior to September 30, 1955, the Crude Oil Company purchased the oil produced along these two systems from the operators of the leases; the Sinclair Pipe Line Company transported it to a tank at Humboldt from which tank it was introduced into a pipe line of the Pipe Line Company, which transported it to Illinois. Under the arrangement entered into between all defendants and pursuant to which they intended to operate subsequent to October 1, 1955, Producers was to own the two systems; was to purchase the oil produced along the Paola-Humboldt system; transport it to Humboldt, where it would sell it to the Crude Oil Company. Producers was to transport only its own oil through its lines. As to the Eureka-Humboldt system, it was arranged that Boyer would purchase oil from the wells on the farms and sell it to the Crude Oil Company.

The petition is based on the theory of the plaintiff that the activities of all four of the defendants must be considered and construed together since the plaintiff contends the whole affair is a plan or device to avoid the jurisdiction of the commission. Behind all the legal actions of the plaintiff is the complaint of the well owners along the Eureka-Humboldt line that they were about to lose the market for their oil.

We shall deal first with the contentions of defendant, the Pipe Line Company. It is well settled that the statutes, to which reference has already been made in this opinion, refer only to intrastate business as distinguished from interstate. Any attempt on the part of state authorities to regulate interstate business would violate the federal constitution. The petition states at first that the Pipe Line Company is doing business in the state of Kansas and is within the designation of a common carrier and a public utility. These are all general allegations. Later on in the petition the business done by it is set out in more detail. It states that the Crude Oil Company acquired a trunk line or main pipe-line system for transportation of crude oil from Humboldt to Illinois, where a refinery of

Sinclair was located; that the Pipe Line Company did not produce any oil but used the systems to transport oil purchased by other Sinclair companies from various producers. Each of the systems was located wholly within the state of Kansas to Humboldt, Kansas. At Humboldt, Kansas, the oil was placed in tanks and then introduced into the pipe line of the Pipe Line Company, which transported the oil to Sinclair's consignees. Elsewhere in the pleadings are allegations which leave no doubt that the only consignee of the Pipe Line Company was the Sinclair Refinery Company in Illinois. Thus it will be seen that while the petition stated the main pipe line was built to transport crude oil from Humboldt to Illinois, as a matter of fact, the crude oil started its interstate journey when it first entered the pipe line near Eureka as it came from the well and continued such journey until it arrived at the refinery in Illinois. The stay in the tank at Humboldt cannot be said to break the continuity of the journey. (See *Eureka Pipe Line Co. v. Hallanan,* 257 U. S. 265, 66 L. ed. 227, 42 S. Ct. 101; also *Pipe Line Co. v. State,* 95 W. Va. 285, 120 S. E. 759; *State ex rel. Hirschi, County Atty., et al. v. Empire Oil & Refining Co.,* 171 Okla. 138, 42 P. 2d 127 and *Clark v. Atlantic Pipe Line Co.,* 134 S. W. 2d 322.)

Once we have established that the Pipe Line Company was engaged exclusively in transportation of crude oil in interstate commerce, the conclusion is inescapable that the commission had no power or authority to regulate it. The third clause of Section 8 of the federal constitution places the control of commerce among the several states in congress. About as many opinions have been written about that clause as any other. Among the early ones was *Gibbons v. Ogden,* 9 Wheat 1, 6 L. ed. 23. To come to a more recent date we have *State of Missouri v. Kansas Natural Gas Co.,* 282 Fed. 341 and *Central Trust Co. v. Consumers Light, Heat & Power Co.,* 282 Fed. 680. These cases were affirmed by the United States Supreme Court. (See *Missouri v. Kansas Gas Co.,* 265 U. S. 298, 68 L. ed. 1027, 44 S. Ct. 544.) There the court said:

"'. . . If a state enactment imposes a direct burden upon interstate commerce, it must fall regardless of Federal legislation. The point of such an objection is not that Congress has acted, but that the State has directly restrained that which in the absence of Federal regulation should be free.' . . .

"The contention that, in the public interest, the business is one requiring regulation, need not be challenged. But Congress thus far has not seen fit to regulate it, and its silence, where it has the sole power to speak, is equiva-

lent to a declaration that that particular commerce shall be free from regulation . . ."

## And the court concluded:

". . . The transportation, sale, and delivery constitute an unbroken chain, fundamentally interstate from beginning to end, and of such continuity as to amount to an established course of business. The paramount interest is not local but national, admitting of and requiring uniformity of regulation. Such uniformity, even though it be the uniformity of governmental nonaction, may be highly necessary to preserve equality of opportunity and treatment among the various communities and states concerned. See, for example: *Welton v. Missouri,* 91 U. S. 275, 282; *Hall v. DeCuir,* 95 U. S. 485, 490."

See, also, *Buck v. Kuykendall,* 267 U. S. 307, 69 L. ed. 623, 45 S. Ct. 324; also *Blease v. Safety Transit Co.,* 50 Fed. 2d 852.

By the Hepburn amendment the interstate commerce act was extended to include common carriers engaged in the transportation of oil by pipe line from one state to another. This amendment did not impose upon carriers of oil by pipe line the requirement that they obtain certificates of public convenience and necessity, neither did the amendment impose upon such carriers the requirement that they obtain a permit to discontinue the use of interstate pipe-line facilities although such permits were at the time of the amendment required of carriers by rail. This is indicative that congress did not intend to make such requirements.

The analogous case is *Lucking v. Detroit Nav. Co.,* 265 U. S. 346, 68 L. ed. 1047, 44 S. Ct. 504. That case had to do with a steamship company, which discontinued a shipping route. The supreme court said:

"The obligation to continue is not imposed by any principle of the common law. Reasonableness of service on a route over which appellee operates boats is not involved. The duty to furnish reasonable service while engaged in business as a common carrier is to be distinguished from the obligation to continue in business. No case has been cited by counsel, and we know of none, in which it has been held that there is any common law duty on a common carrier by water not to cease to operate its boats.

"Carriers by water, such as appellee, are within the terms of the Transportation Act for certain purposes; *e. g.,* for the regulation of their accounts, the making of reports, the prevention of rebates, discrimination and the like. Certain provisions of the act are applicable to some carriers and not to others. *Interstate Commerce Commission v. Goodrich Transit Co.,* 224 U. S. 194, 208. The imposition of a duty upon a carrier by water to furnish transportation upon reasonable request does not create an obligation to continue to operate boats on a particular route. The provision of subd. (18) above referred to is specifically limited to lines of railroad. This indicates legislative intention that carriers by water are not required to continue and may cease to operate if they see fit.

"No duty to continue to operate its boats on the Detroit and Mackinac Island route is imposed on appellee by its charter, the statutes of Michigan, the common law or Federal statutes."

Our own decisions are to the effect that the authority of the state corporation commission to supervise and control public utilities and common carriers doing business in the state of Kansas does not include the power to directly regulate or burden interstate carriers. (See *Railroad Co. v. Utilities Commission et al.,* 114 Kan. 190, 217 Pac. 322.) The commission ordered certain improvements in telegraph service at Oberlin, Kansas. The district court denied the application of the company for an injunction. On appeal this court reversed. We held the poor service of which complaint was made was interstate in character and the order was an attempt to affect a business that was withdrawn from state control. In *The State, ex rel., v. Telegraph Co.,* 117 Kan. 651, 232 Pac. 1038, we said:

"The public utilities commission must concede that interstate business is free from state control, and that the commission has no jurisdiction to regulate or control that part of the business."

See *The State, ex rel., v. Postal Telegraph Co.,* 96 Kan. 298, 150 Pac. 544; *The State, ex rel., v. Telephone Co.,* 102 Kan. 318, 170 Pac. 26; *State, ex rel., v. St. Louis-S. F. Rly. Co.,* 124 Kan. 433, 260 Pac. 980; *State Comm'n v. Wichita Gas Co.,* 290 U. S. 561, 78 L. ed. 500, 54 S. Ct. 321; and *Smith v. Sekan Electric Cooperative Ass'n,* 177 Kan. 397, 279 P. 2d 309.

The commission argues that prevention of waste and conservation of natural resources is a legitimate object of state regulation even if an incidental burden is placed on interstate commerce. The petition alleges that the abandonment of the Eureka system would result in many stripper wells being shut down, which in turn would result in economic waste. The petition alleges that the facts concerning waste were set out to indicate that a serious question concerning it existed and it should be presented to the commission in order that it and its administrative conservation specialists may determine whether the proposed plan of the defendants will result in physical and economical waste prohibited by statute. The petition states that the statutes give the commission administrative jurisdiction over matters concerning such waste. It would be idle to require the defendants to submit problems as to waste to the commission unless the commission had jurisdiction to make some order with reference to it.

The statutes with reference to waste are G. S. 1949, 55-601 to 55-

608, inclusive. The production of crude oil in such a manner as to constitute waste is prohibited by G. S. 1949, 55-601, and made a crime by G. S. 1949, 55-607. The statute refers only to production. Sinclair, as we have demonstrated, is engaged strictly in interstate transportation of crude oil. The Oklahoma statute on waste is almost identical to ours. In speaking of that statute, the supreme court of the United States held in *Champlin Rfg. Co. v. Corporation Commission*, 286 U. S. 210, 76 L. ed. 1062, 52 S. Ct. 559:

"It is clear that the regulations prescribed and authorized by the Act and the proration established by the commission apply only to production and not to sales or transportation of crude oil or its products."

We find nothing in the so-called waste statutes to justify the issuance of a peremptory writ against the Pipe Line Company.

We next consider the situation of the Producers. The plaintiffs point out that Producers bought the two pipe-line systems and as they buy the oil at the leases, transport it in its own pipe line to Humboldt, where it sells it to the Crude Oil Company. Plaintiff argues that Producers purchases the oil for resale and the transportation of such oil cannot be held to be the operation of the pipe line for private use.

The statute pursuant to which the commission argues Producers were required to ask for a certificate of convenience and authority is G. S. 1949, 66-131. It reads as follows:

"No common carrier or public utility governed by the provisions of this act shall transact business in the state of Kansas until it shall have obtained a certificate from the corporation commission that public convenience will be promoted by the transaction of said business and permitting said applicants to transact the business of a common carrier or public utility in this state. This section shall not apply to any common carrier or public utility governed by the provisions of this act now transacting business in this state."

The statute is of limited application. (See *Humphrey v. City of Pratt*, 93 Kan. 413, 144 Pac. 197; *Board of Public Utilities v. Kansas City P. & L. Co.*, 139 Kan. 842, 33 P. 2d 320; and *Kansas Gas & Elec. Co. v. City of McPherson*, 146 Kan. 614, 72 P. 2d 985.)

G. S. 1949, 66-101 confers on the commission power to regulate public utilities and all common carriers as herein defined. The statute defining public utilities subject to regulation is G. S. 1949, 66-104. It provides as follows:

"The term 'public utility,' as used in this act, shall be construed to mean every corporation, company, individual, association of persons, their trustees, lessees or receivers, that now or hereafter may own, control, operate or manage,

except for private use any equipment, plant, generating machinery, or any part thereof, for the transmission of telephone messages or for the transmission of telegraph messages in or through any part of the state, or the conveyance of oil and gas through pipe lines in or through any part of the state, except pipe lines less than 15 miles in length and not operated in connection with or for the general commercial supply of gas or oil, . . ."

The term "common carriers" is defined by G. S. 1949, 66-105. That section provides as follows:

"The term 'common carriers,' as used in this act, shall include all railroad companies, express companies, street railroads, suburban or interurban railroads, sleeping-car companies, freight-line companies, equipment companies, pipe-line companies, and all persons and associations of persons, whether incorporated or not, operating such agencies for public use in the conveyance of persons or property within this state."

Clearly the legislature intended regulation by the commission to apply only to such activities as pipe lines, when they were operated for public use in intrastate commerce. To constitute one a common carrier there must be a holding out to the public generally. (See 1 *Bouvier's Law Dictionary*, (3rd ed.), p. 553; 1 *Hutchinson, Carriers*, (3rd ed.), § 41; 9 *Am. Jur., Carriers*, § 5, p. 432; 13 *C. J. S., Carriers*, § 3, p. 25 *et seq.; Michigan Commission v. Duke*, 266 U. S. 570, 69 L. ed. 445, 45 S. Ct. 191.) The Producers is not a common carrier under the provisions of G. S. 1949, 66-101, 104 and 105.

Having reached the above conclusion as to the Sinclair Pipe Line Company and Producers Pipe Line Company, it will not be necessary to deal with the arguments of either party as to the other two defendants.

One further contention of defendants is that mandamus is not the proper remedy in such an action as this. It is well established the state on the relation of the attorney general or the corporation commission, or both, may bring a mandamus action to compel any person or corporation, subject to it, to make proper application as provided in the act such as the relief prayed for here.

Judgment is for the defendants.

FATZER, J., not participating.

PRICE, J., specially concurring: Looking through form to substance, it is my opinion that the relief actually sought in this case is injunctive in nature, over which this court has no original jurisdiction. For that reason I would dismiss the action under the rule

440

stated in *Collins v. York*, 175 Kan. 511, 265 P. 2d 313, and authorities cited therein.

If, however, the court does have jurisdiction of the action, I am in agreement that judgment should be for defendants.